1  John J. Hebert (#010633)
   Mark W. Roth (#010708)
2  Mary B. Martin (#019196)
   Wesley D. Ray (#026351)
3  **POLSINELLI SHUGHART PC**
   CityScape Plaza
4  One E. Washington, Suite 1200
   Phoenix, AZ 85004
5  Telephone: (602) 650-2000
   Facsimile: (602) 264-7033
6  E-mail: PhoenixBankruptcyECF@polsinelli.com
   E-Mail: jhebert@polsinelli.com
7  E-Mail: mroth@polsinelli.com
   E-Mail: mmartin@polsinelli.com
8  E-Mail: wray@polsinelli.com

9  *Attorneys for Debtors*

10                **IN THE UNITED STATES BANKRUPTCY COURT**

11                     **THE DISTRICT OF ARIZONA**

| | |
|---|---|
| In re: | Chapter 11 Proceedings |
| LONE TREE INVESTMENTS, LLC | Case No. 2:10-bk-26776-RTBP |
| PINE CANYON GOLF, L.L.C. | Case No. 2:10-bk-26779-RTBP |
| MOUNTAIN VISTA AT PINE CANYON, L.L.C. | Case No. 2:10-bk-26785-RTBP |
| ELK PASS, L.L.C. | Case No. 2:10-bk-26790-RTBP |
| DEER CREEK CROSSING, L.L.C. | Case No. 2:10-bk-26792-RTBP |
| CREEKSIDE VILLAGE HOMES, LLC | Case No. 2:10-bk-26794-RTBP |
| Debtors. | Joint Administration under Case No. 2:10-bk-26776-RTBP |
| This filing applies to: | **DEBTORS' FIRST AMENDED JOINT DISCLOSURE STATEMENT RELATING TO FIRST AMENDED JOINT PLAN OF REORGANIZATION DATED JANUARY 24, 2011** |
| ☒ ALL DEBTORS | |
| ☐ SPECIFIED DEBTORS. | |

This document is the Joint Disclosure Statement of LONE TREE INVESTMENTS, LLC, PINE CANYON GOLF, L.L.C., MOUNTAIN VISTA AT PINE CANYON, L.L.C., ELK PASS, L.L.C., DEER CREEK CROSSING, L.L.C., and CREEKSIDE VILLAGE HOMES, LLC (collectively the "Debtors"), as debtors-in-possession in the above-entitled jointly administered Chapter 11 cases. This Joint Disclosure Statement is submitted by the Debtors, through their attorneys, Polsinelli Shughart, P.C., pursuant to 11 U.S.C. § 1125.

2781247.1

## I.      INTRODUCTION

11 U.S.C. § 1125(b) prohibits the solicitation of acceptances or rejections of a Plan of Reorganization unless such Plan is accompanied by a copy of the Disclosure Statement which has been approved by the Bankruptcy Court.

The purpose of this Disclosure Statement is to provide creditors and interested parties in this bankruptcy proceeding with such information as may reasonably be deemed sufficient to allow creditors and interested parties to make an informed decision regarding the Debtors' "First Amended Joint Plan of Reorganization dated January 24, 2011" (the "Plan").

Unless otherwise noted, those portions of the Plan and this Disclosure Statement providing factual information concerning the Debtors, their assets and liabilities, have been prepared from information submitted by the Debtors and their retained professionals.

This Disclosure Statement contains information that may influence your decision to accept or reject the Debtors' proposed Plan.  Please read this document with care.

The financial information contained in this Disclosure Statement has not been subjected to an audit by an independent certified public accountant.  For that reason, the Debtors are not able to warrant or represent that the information contained in this Disclosure Statement is without any inaccuracy.  To the extent practicable, the information has been prepared from the Debtors' financial books and records and great effort has been made to ensure that all such information is fairly represented.

This Disclosure Statement and the Plan will classify all creditors into Classes.  The treatment of each Class of creditors will be set forth in this Disclosure Statement and in the Plan. You should carefully examine the treatment of the Class to which your Claim will be assigned.

This Disclosure Statement requires approval by the Bankruptcy Court after notice and a hearing pursuant to 11 U.S.C. §1125(b).  Once approved, the Disclosure Statement will be distributed with the Debtors' proposed Plan for voting.  Approval of the Disclosure Statement by the Bankruptcy Court does not constitute either certification or approval of the Debtors' Plan by the Bankruptcy Court or that the Disclosure Statement is without any inaccuracy.

2781247.1

The Bankruptcy Court will confirm the Plan if the requirements of §1129 of the Bankruptcy Code are satisfied. The Bankruptcy Court must determine whether the Plan has been accepted by each impaired Class entitled to vote on the Plan. Impaired Classes entitled to vote on the Plan are those Classes of claims whose legal, equitable, or contractual rights are altered, as defined under §1124 of the Bankruptcy Code. An impaired Class of claims is deemed to have accepted the Plan if at least two-thirds (2/3) in amount of those claims who vote and more than one-half (1/2) in number of those claims who vote have accepted the Plan. An impaired Class of interests is deemed to have accepted the Plan if the Plan has been accepted by at least two-thirds (2/3) in amount of the allowed interests who vote on the Plan.

Even if each Class of creditors does not accept the Plan, the Plan can be confirmed under §1129(b) of the Bankruptcy Code, so long as one impaired Class of creditors accepts the Plan. This is referred to as the "cram down" provision of the Bankruptcy Code. The failure of each Class to accept the Plan could very well result in a conversion of this case to Chapter 7 or dismissal of the Chapter 11.

Only the votes of those creditors or interested parties whose ballots are timely received will be counted in determining whether a Class has accepted the Plan.

## II.     DEFINITIONS

The definitions set forth in Article I of the Plan apply in this Disclosure Statement except to the extent other definitions are set forth in this Disclosure Statement.

## III.     THE DEBTORS, BACKGROUND, AND EVENTS PRECIPITATING THE CHAPTER 11

### A.     Debtors

***Lone Tree Investments, LLC*** ("Lone Tree"), is an Arizona limited liability company. Its members are Flagstaff Acquisitions, LLC, which owns 99% of Lone Tree, and Central and Osborn Properties, Inc. ("C&O"), which serves as manager of Lone Tree and owns the remaining 1%.

Lone Tree is the primary developer of Pine Canyon, a 620-acre private residential golf course community in Flagstaff, Arizona. Lone Tree owns the entry house, sales office, Clubhouse, golf course and all other member-affiliated amenities (the swimming pools, tennis courts, park area,

lakes, etc), as well as many of the private streets and other areas set aside in the development for engineering matters (retention areas, etc.) on which construction is not planned.  To date, Lone Tree has sold 273, and still owns 38, fully developed "estate lots" of a half-acre or larger which are entitled for single-family residences.  It also owns all of the undeveloped parcels in the subdivision that are intended for future residential housing.  These parcels are in varying stages of entitlement, platting, etc.  The legal descriptions of the properties owned by Lone Tree (or held in a subdivision trust the beneficiary of which is Lone Tree) are shown on Exhibit "A" attached hereto.

*Creekside Village Homes, LLC*, a wholly-owned subsidiary of Lone Tree, has constructed and sold 92 single-family homes within the Creekside neighborhood of Pine Canyon.  These lots and the homes on them were sold as "turnkey" residences.  Currently, the company (or a subdivision trust the beneficiary of which is this company) owns the private streets and a few parcels in the neighborhood on which no construction is anticipated.  The legal descriptions of the properties are shown on Exhibit "B" attached hereto.

*Deer Creek Crossing, LLC*, a wholly-owned subsidiary of Lone Tree, is the developer of the newest neighborhood in Pine Canyon.  It was originally platted for 38 single-family residential lots and marketed as another "turnkey" area where a buyer would select a lot (smaller in size than the estate lots) and select one of a variety of floor plans and then the developer (or a related entity) would construct the selected home on the selected lot.  No such sales have been made and, recently, seven of the 38 parcels were re-platted to 11 "cabin" lots on which smaller single family residences could be built.  None of the cabin lots have yet been sold.  All of the parcels in this neighborhood as well as its private streets and land where no construction is planned are owned by the company (or a subdivision trust the beneficiary of which is this company).  The legal descriptions of the properties are shown on Exhibit "C" attached hereto.

*Elk Pass, LLC,* a wholly-owned subsidiary of Lone Tree, is developing the initial townhome neighborhood of Pine Canyon.  There are 23 planned buildings, with two attached residences in each.  Thirteen buildings (26 residences) have been constructed and 24 of the residences have been sold.  As such, this entity (or a subdivision trust the beneficiary of which is this company) currently owns two finished residences that are available for sale and 20 parcels on

4

which residences can be constructed. In addition, the company owns the private roads in the neighborhood as well as a few parcels on which construction is not planned. The legal descriptions of the properties are shown on Exhibit "D" attached hereto.

*Mountain Vista at Pine Canyon, LLC*, a wholly-owned subsidiary of Lone Tree, is developing 60 condominiums at Pine Canyon. Three of the planned 15 four-unit buildings (12 unit's total) have been completed and nine of those units have been sold. This entity (or a subdivision trust the beneficiary of which is this company) owns the three unsold units, the parcels on which the remaining 48 units will be constructed, all of the common areas that surround the condominium buildings, the private roads in the neighborhood, and a few parcels on which no construction is planned. The legal descriptions of the properties are shown on Exhibit "E" attached hereto.

*Pine Canyon Golf, LLC*, a wholly-owned subsidiary of Lone Tree, operates The Pine Canyon Club and owns no real property. It manages the Clubhouse, golf course, fitness center and spa, pro shop, tennis courts, swimming pools, children's activities, and other club amenities.

**B.    Background**

In 2000 and early 2001, Lone Tree acquired the property on which it is developing Pine Canyon. The development of infrastructure started almost immediately and lot reservations started in 2002. The first sales were closed in January 2003 and Pine Canyon was named as one of the "Top Ten Places to Buy" by *Mountain Living Magazine* in 2006.

A championship private golf course was designed for Pine Canyon by renowned golf course designer - Jay Morrish. It opened in May 2004 to rave reviews and, among other awards, has been named as one of the 2005 Top Ten New Private Golf Courses by *Golf Digest*, as one of the 2005 Ten Best New Private Courses by *Travel and Leisure Golf* and as a Residential Course of Distinction by *Golf Week*. In its first year of eligibility (2007/2008), the course was named as the fourth best in the state of Arizona by *Golf Digest*.

Golf memberships in The Pine Canyon Club are limited to 425. To date, there are approximately 200 golf members. In addition, The Pine Canyon Club has an unlimited number of sports memberships available, which entitle the holder to all the benefits and amenities of The Pine

Canyon Club except golf.  There are currently approximately 65 sports members.

In August 2006, Pine Canyon opened its Clubhouse, a 35,000 square foot facility overlooking the 18th hole and lake.  With both fine and casual dining, a 1,700-bottle wine room, a 1,600 square foot state-of-the-art fitness center, an aerobics room and a spa, it hosts many social events for its members and houses the men's and ladies' locker rooms as well as the pro shop.

The Clubhouse won the 2007 Gold Nugget Grand Award in the Best Public / Private Recreational Use category.  The oldest and largest program of its kind, the Gold Nugget Awards are presented by the Pacific Coast Builders and honor creative achievements in architectural design and land use planning for 5 residential, commercial, and industrial projects and reward excellence and innovation in addressing complex design issues.  In 2008, the Clubhouse was named Best Clubhouse of the Year by *Golf Inc. Magazine.*

In the spring of 2008, Camp Pine Canyon was opened.  Camp Pine Canyon is a facility designed with particular attention to the younger residents.  It includes a 3,500 square foot recreation center, two tennis courts, a basketball court and three swimming pools (complete with a toddler pool, waterfalls, and a water slide).  Camp Pine Canyon is staffed with specially trained professionals who oversee a wide variety of activities for children of all ages, including arts and crafts, field trips to area attractions and structured onsite sports activities.  Camp Pine Canyon and Trout Creek Park provide areas for volleyball, horseshoes and badminton as well as both walking and exercise courses and a fully-stocked lake.  Rounding out this amenity are a ramada with seating for 50, a deluxe children's playhouse, swing sets and a climbing area, each built to the very high standards set for all of Pine Canyon.  Camp Pine Canyon received an Award of Merit in the 2009 Gold Nugget Awards as an Outstanding Public / Private Recreational Use Facility.

The development of the project and all of its amenities has resulted in the developer having $30 million into Pine Canyon in equity and considerably more in loans.

In addition to the development of its luxury residential products and outstanding Club amenities, Lone Tree has assembled a top notch management team.  The President of The Pine Canyon Club for the past five years is Warren Smith, who came to Pine Canyon from the Bighorn Golf Club in Palm Desert, California where he was the Vice President and General Manager for

over ten years.  Prior to his affiliation with Big Horn, Warren spent seventeen years at the Sunrise Company where he coordinated all club operations and the development of six country club communities with over 6,000 condominiums and single-family residences.

The entire management staff has similar credentials.  Les Tengan is the Clubhouse Manager.  Before coming to Pine Canyon he served as the Clubhouse Manager/Food and Beverage Director at the Kuki'o Golf and Beach Club in Hawaii for seven years.  Jim McNeill, the executive chef, has over twenty-five years of culinary experience and held the executive chef position with Palm Valley Country Club and Bighorn Golf Club in California.  Andy Ford, the director of golf, has been with Pine Canyon since 1996.  Before that, he was the Director of Golf for the Vintage Club in Indian Wells, California for ten years.  John Schraan, the Chief Financial Officer, is a certified public accountant with over twenty-five years of banking, accounting, and financial management experience.

### C.    Events Precipitating the Chapter 11 Filings

In June 2008, the Debtors acquired a $25,000,000 revolving line of credit from Johnson Bank to retire the existing acquisition and development debt and to build the semi-custom homes at Deer Creek, the condominiums, the townhomes, and the remaining infrastructure of the development.

The original maturity date of the loan was June 26, 2009, but was extended through June 24, 2010 by two separate agreements.  Prior to the bankruptcy filing, the Debtors were in close consultation with Johnson Bank seeking to find an accommodation whereby the Debtors could more effectively respond to and thrive in the present economic downturn.  The Debtors and Johnson Bank were unable to arrive at an agreement on how to manage their relationship in the face of the economic downturn.  This inability to arrive at a common understanding precipitated the Debtors' bankruptcy filing.  Johnson Bank believes that the Debtors' bankruptcy was caused, in part or in full, by the actions or inactions of the Debtors' management in preparing for or responding to changes in the real estate market.

As of the petition date, the Debtors were indebted to Johnson Bank in the approximate amount of $24,275,826.  According to an appraisal conducted by Appraisal Technology, Inc. at

7

Johnson Bank's request (the "ATI Appraisal"), as of May 6, 2010, the collateral securing Johnson Bank's claim, with some notable omissions, was valued at approximately $60,120,000. The ATI Appraisal did not include all of the elements of Johnson Bank's purported collateral. Many of these tracts constitute the private roads within the Pine Canyon development. Others are various parcels set aside for drainage and other engineering needs and yet others are currently designated as open areas (including the common areas surrounding condominium parcels). Significantly, the ATI Appraisal also excludes (a) the entry house at the main entrance to the community and the parcel on which it is constructed; (b) the sales office and the property on which it is constructed; and (c) estate lot 275. The latter is currently listed for sale at $1,200,000.

Johnson Bank takes issue with the ATI Appraisal in several respects, and does not believe that it provides an accurate estimate of the value of its collateral. If the value of the Property is determined to be materially less than the value contained in the ATI Appraisal, it may have a negative impact on the feasibility and confirmability of the Plan.

### D. Business Plan and Projections

The Debtors intend to continue operating The Pine Canyon Club and facilities as well as continue its business as a developer of residential homes in the Pine Canyon community.

The Debtors intend to continue to develop and sell homes and residential lots in order to fund their reorganization. The Debtors' current inventory includes three single family residences, three condominiums, two townhomes, 20 lots on which additional townhomes can be constructed, and 80 residential lots located within the Property.

Additionally, pursuant to the Plan, the Debtors will sell to Johnson Bank, or the highest bidder, pursuant to Section 363 of the Bankruptcy Code, that real property described in the attached Exhibit "F." The value of the property sold, according to the ATI Appraisal, is in excess of $18.0 million. The sale will be conducted under these terms and conditions:

      1.      Johnson Bank must credit bid a minimum of $17.0 million.

      2.      Other bidders may make bids, so long as the opening bid exceeds $17.0 million. Increments thereafter will be in the amount of $100,000.

2781247.1

3.    The sale will be advertised in newspapers of general circulation in Maricopa and Coconino Counties, as well as other media agreed upon between the Debtors and Johnson Bank, or as ordered by the Court.

4.    The Court will enter an order transferring the property free and clear of liens and interests to the high bidder.

5.    The Court will make a fining of a good faith sale under Section 363(m).

6.    Purchasers of the property sold shall be entitled to the same rights with regard to the Pine Canyon Golf Club facilities and memberships, as purchasers of the property retained by the Debtors (the "Retained Property").

7.    The property sold will remain subject to any existing covenants, conditions and restrictions.

8.    The remaining balance due and owing to Johnson Bank on its Allowed Secured Claim shall be the lesser of $8.0 million or the remaining amount after crediting the Johnson Bank claim with the high bid from the 363 sale.

9.    The remaining obligation to Johnson Bank shall mature and become dully due and payable on the 10th anniversary of the Effective Date (the "Maturity Date").

The Debtors' projections of cash flow reflecting the sources and uses of cash, including the Debtors' anticipated revenues, and the infusion of cash from the Post Confirmation Credit Facility for the five year period following confirmation of the Plan, is attached hereto as Exhibit "G". These projections, and the assumptions employed therein, are based upon the experience and expertise of the Debtors' management, after reasonable research and analysis, and represent a good-faith estimate of the Debtors' future performance.

E.    Operations

In order to provide for efficient and productive operations, the Debtors intend to retain the same management team and structure that existed pre-petition. The issues confronted by the Debtors that led to the bankruptcy filings were the product of market changes, not the Debtors' management or its structure. Thus, a change in management structure is not in the best interests of the Debtors or their creditors because the existing structure is appropriate to meet the needs of the Debtors. By maintaining its current management and operational structure, the Debtors will avoid

2781247.1

the transactional costs associated with significant and unnecessary change. In addition, the knowledge and experience of the management team will be preserved.

## IV. AVOIDANCE ACTIONS

To the extent that a preference or fraudulent conveyance occurred before the bankruptcy filing, such transfer may be recoverable by the bankruptcy estates for the benefit of the estates under §§ 544, 547, or 548 of the Bankruptcy Code.

Johnson Bank claims to be secured by certain personal property owned by the Debtors. The Debtors have or will be filing an avoidance action under Section 544 of the Bankruptcy Code, seeking to avoid the claimed lien on the Debtors' personal property.

The Debtors are analyzing the claim of San Francisco Peaks Associates LP relating to an alleged agreement to transfer a Deer Creek lot in satisfaction of its claim.

The Debtors are not currently aware of any other causes of action for the recovery of preferences or fraudulent conveyances. To the extent any other claims exist, they will be analyzed for their potential value to the estates. These potential claims are specifically preserved for the benefit of the bankruptcy estates. Any recovery that is obtained will be obtained for the benefit of the estates.

## V. SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE

### A. Administrative Proceedings

The Debtors filed their Petitions for Relief under Chapter 11 on August 24, 2010. The cases were ordered jointly administered on August 26, 2010. The first meeting of creditors was held on September 28, 2010.

### B. Retention of Professionals

The Debtors retained Polsinelli Shughart, P.C. ("PS") to act as their original bankruptcy counsel. The Court signed an Order approving the retention of PS on September 7, 2010.

On September 10, 2010, the Debtors applied for authority to retain Gammage & Burnham, P.L.L.C. ("G&B") to act as special counsel. An Order was entered by the Court authorizing such retention on September 13, 2010.

2781247.1

On September 10, 2010, the Debtors applied for authority to retain the Udall Law Firm L.L.P. ("Udall") to act as special litigation counsel. An Order was entered by the Court authorizing such retention on September 13, 2010. On November 9, 2010, the Debtors filed an application for a supplemental order expanding the scope of Debtors' retention of Udall to include reviewing proposed construction agreements relating to homes to be constructed upon the Debtors' real property and handling any construction-related matters arising with respect thereto. An Order was entered by the Court on November 12, 2010 approving of this expansion of Udall's retention.

PS, G&B and Udall continue to represent the Debtors in these bankruptcy cases.

By application made September 20, 2010, and Order of the Court entered September 21, 2010, the Debtors retained Guest, Schutte, Cosper & Ledbetter, L.L.P. to assist with the accounting during their reorganization and review the Debtors' financial statements.

**C.  First Day Motions**

The Bankruptcy Court approved the following First Day Motions on or about August 26, 2010:

1.  Motion for Joint Administration and Approval of a Consolidated Caption;

2.  Motion for Change of Hearing Site;

3.  Motion to Approve Debtor-In-Possession Financing;

4.  Motion to Authorize Payment of Pre-Petition Wages, Benefit Contributions, and Reimbursements; and

5.  Motion to Sell Homes and Residential Lots in the Ordinary Course of Business.

**D.  Other Bankruptcy Court Orders**

To date, the Bankruptcy Court has approved various motions for relief designed to allow the Debtors to continue normal operations. The Bankruptcy Court has issued numerous Orders, including an Order authorizing the Debtors to sell real property in the ordinary course of business, entered on September 28, 2010, and to sell interim golf and sports memberships, entered on November 12, 2010.

**E.  Appointment of Unsecured Creditors Committee**

The United States Trustee's Office filed a statement stating that, despite its efforts to contact

11

2781247.1

unsecured creditors, it was unable to appoint a Committee of Unsecured Creditors.

**F.   Operating Reports**

The Debtors' monthly operating reports are current or will be current and copies can be obtained from the Court's electronic docket.

**VI.   DESCRIPTION OF ASSETS AND LIABILITIES OF THE DEBTORS**

The values ascribed to the Debtors' assets below are based on the Debtors' best estimate and other factors such as the purchase price, comparable sales, tax assessments, and appraisals.

**A.   Assets**

**1.   Real Property and Personal Property** – At the time of the filing of their Petitions, the Debtors owned the real property described above in this Disclosure Statement.  The Debtors list the value of the real property as in excess of $63.7 million in their Schedules and the value of the personal property as $7.1 million.  A summary of the ATI Appraisal is attached hereto as Exhibit "H."

Since the filing of their Petitions, the Debtors have sold the real property described as Units 18 and 26 of Elk Pass; and Units 53 and 54 of Mountain Vista Condominium.

**B.   Liabilities**

The Debtors' liabilities, as provided for in the Plan, are as follows:

**1.   Priority Claims**

a.   The Debtors expect that, at the time of confirmation, they will have priority obligations arising from the Post-Petition Advance from Flagstaff Acquisitions, LLC, and approximately $11,725 from pre-petition deferred compensation claims entitled to administrative priority.

b.   Arizona Department of Revenue: The Debtors estimate taxes owed to the Arizona Department of Revenue in the amount of $61,000.

c.   City of Flagstaff: The Debtors estimate sales taxes owed to the City of Flagstaff in the amount of $17,000.

**2.   Secured Claims**

a.   **Secured Claim of Johnson Bank**

12

2781247.1

The Debtors' Schedules list the principal amount of Johnson Bank's claim as approximately $24,275,826 as of the Petition Date. Since the Petition Date, Johnson Bank has received payment of no less than $412,251.08 through the Post Petition Advance and sales of real property. The current principal amount of Johnson Bank's claim is approximately $23,863,574.51. The claim is alleged to be secured by a lien on certain real property of one or more of the Debtors.

      **b.**            **Secured Claims of the Coconino County Treasurer**

The County of Coconino, Arizona ("Coconino County") holds a claim for property taxes, in the approximate amount of $285,000 that is secured by a lien on certain of the Debtors' real property.

      **c.**            **Secured Claim of GMAC Financial Services**

GMAC Financial Services holds a claim in the approximate amount of $31,980 secured by a lien on a GMC Sierra.

      **d.**            **Secured Claim of Sandra K. Stevens**

Sandra K. Stevens holds a claim in the approximate principal amount of $10,000 secured by a lien on certain personal property of the Debtors.

      **e.**            **Secured Claim of Wespac Residential, Inc.**

Wespac Residential, Inc. asserts a claim in excess of $700,000 secured by a mechanic's lien recorded against lots 30, 45 and 46 in Elk Pass. The claim has tentatively been settled and the parties are drafting a settlement agreement for court approval now.

      **f.**            **Secured Claim of General Electric Capital**

This Claim is alleged to be secured by a valid and perfected lien on certain equipment described under that certain contract no. 4431199-003.

**3.**      **Unsecured Claims**

      **a.**            **Claim of San Francisco Peaks Associates LP**

This Claimant asserts a claim based on an alleged agreement to transfer a Deer Creek lot in satisfaction of the claim.

      **b.**            **Unsecured Claims of Club Members holding Golf Memberships**

The Debtors estimate that the claims of Club Members arising from their right to a refund of

2781247.1

their respective golf membership deposits total approximately $13 million.

                        **c.       Unsecured Claims of Club Members holding Sports Memberships**

The Debtors estimate that the claims of Club Members arising from their right to a refund of their respective sports membership deposits total approximately $500,000.

                        **d.       Unsecured Claims of Flagstaff Acquisitions, LLC**

According to the Debtors' Schedules, the principal amount of the claim of Flagstaff Acquisitions, LLC is approximately $17,800,000.

                        **e.       Unsecured Claims of O'Connor Investment Partnership**

According to the Debtors' Schedules, the principal amount of the claim of O'Connor Investment Partnership is approximately $1,000,000.

                        **f.       General Unsecured Creditors**

The Debtors estimate that creditors currently hold unsecured claims, not described above, in the approximate amount of $1,340,000.

                 **4.    Administrative Expenses**

The Debtors' administrative expenses consist of the fees and costs of attorneys and other professionals necessary to the Debtors' operations, bankruptcy case, and plan of reorganization. The fees and costs of these professionals will not be precisely known until the Bankruptcy Case is completed. However, as set forth below, the Debtors' professionals anticipate that either (a) the retainers they presently have will be sufficient to cover the services they have rendered, and will render, in the Bankruptcy Cases, or (b) for those professionals that do not have retainers and will be paid by some other manner, their projected anticipated fees and costs for their services will be commensurate with their historical fees and costs.

The Debtors' bankruptcy counsel is PS. At the time the Petitions were filed, PS was in possession of a retainer in the amount of $235,000. PS anticipates its fees will be less than the amount of the retainer. However, to the extent that PS's fees and costs exceed the amount of the retainer, PS's fees and costs will constitute administrative claims against the Debtors' estates.

2781247.1

The Debtors' general counsel is G&B. G&B considers the Debtors as institutional clients and does not hold a retainer. G&B currently anticipates its fees during the bankruptcy will not exceed $150,000.

The Debtors' special counsel for commercial litigation and construction related matters is Udall. Udall anticipates its fees during the bankruptcy will not exceed $100,000.

The Debtors have also retained Guest, Schutte, Cosper & Ledbetter, L.L.P. to assist with the accounting during the reorganization and to review the Debtors' financial statements. It is anticipated that the total unpaid fees and costs incurred by Guest, Schutte, Cosper & Ledbetter, L.L.P. in relation to this matter, through confirmation, will be approximately $20,000.

## VII.    PLAN SUMMARY

THE FOLLOWING STATEMENTS CONCERNING THE PLAN ARE MERELY A SUMMARY OF THE PLAN AND ARE NOT COMPLETE. THE STATEMENTS ARE QUALIFIED ENTIRELY BY EXPRESS REFERENCE TO THE PLAN. CREDITORS ARE URGED TO CONSULT WITH COUNSEL OR EACH OTHER IN ORDER TO UNDERSTAND THE PLAN FULLY. THE PLAN IS COMPLETE, INASMUCH AS IT PROPOSES A LEGALLY BINDING AGREEMENT BY THE DEBTORS. AN INTELLIGENT JUDGMENT CANNOT BE MADE WITHOUT READING IT IN FULL.

### CLASSIFICATION OF CLAIMS AND INTERESTS

**A.    Class 1: Priority Claims**

**Class 1-A** consists of Allowed Priority Claims under 11 U.S.C. §§ 503 and 507(a)(2), including but not limited to ordinary course post petition operating expenses. (Administrative Claims).

**Class 1-B** consists of Allowed Priority Claims under 11 U.S.C. § 507(a)(4) (Wage Claims).

**Class 1-C** consists of Allowed Priority Claims under 11 U.S.C. § 507(a)(8) (Tax Claims).

**B.    Class 2: Allowed Post Petition Claim of Flagstaff Acquisitions, LLC**

Class 2 consists of the Allowed Post Petition Claim of Flagstaff Acquisitions, LLC relating to the Debtors' Post-Petition Advance.

**C.    Class 3: Secured Claims**

2781247.1

Class **3-A** is comprised of the Allowed Secured Claims of Johnson Bank.

Class **3-B** is compromised of the Allowed Secured Claims of the Coconino County Treasurer that are secured by the Debtors' real properties.

Class **3-C** is comprised of the Allowed Secured Claim of GMAC Financial Services.

Class **3-D** is comprised of the Allowed Secured Claim of Sandra K. Stevens.

Class **3-E** is comprised of the Allowed Secured Claim of Wespac Residential, Inc.

Class **3-F** is comprised of the Allowed Secured Claim of General Electric Capital Corp.

**D.    Class 4:  Allowed Claim of San Francisco Peaks Associates LP**

Class 4 consists of the Allowed Claim of San Francisco Peaks Associates LP relating to the Deer Creek property.

**E.    Class 5: Allowed Unsecured Claims of Club Members holding Golf Memberships**

**F.    Class 6 Allowed Unsecured Claims of Club Members holding Sports Memberships**

**G.    Class 7 Allowed Unsecured Claims of Flagstaff Acquisitions, LLC**

Class 7 consists of the Allowed Unsecured Claims of Flagstaff Acquisitions, LLC.

**H.    Class 8: Allowed Unsecured Claims of O'Connor Investment Partnership**

Class 8 consists of the Allowed Unsecured Claims of O'Connor Investment Partnership.

**I.    Class 9: General Unsecured Creditors**

Class 9 consists of all the Allowed General Unsecured Claims of Creditors in these cases that are not otherwise treated in the Plan.

**J.    Class 10: Interest Holders**

Class 10 consists of the Allowed Interests of the Interest Holders of the Debtors.

**IMPAIRMENT OF CLASSES**

Classes **1-A, 1-B, 1-C** and **2** are unimpaired under the Plan.  All other Classes are impaired, as that term is defined in 11 U.S.C. § 1124.

16

2781247.1

**TREATMENT OF CLASSES**

A.      **Priority Claims**

1.      **Class 1-A:  Administrative Claims**

This Class consists of Allowed Priority Claims under 11 U.S.C. § 503 and § 507(a)(2). Unless Claimants holding Claims in this Class agree to an alternative form of treatment, the Allowed Claims of Class 1-A shall be paid in full, in cash, on or before the Effective Date or as the same are allowed and ordered paid by the Court.  Any Class 1-A Claim not allowed as of the Effective Date shall be paid as soon thereafter as it is allowed by the Court according to the terms of this Class.  This class is not impaired.

2.      **Class 1-B: Wage Claims**

This Class consists of Allowed Priority Claims under 11 U.S.C. § 507(a)(4).  As provided in 11 U.S.C. § 1129(a)(9)(B), unless Claimants holding Claims in this Class agree to an alternative form of treatment, the Allowed Priority Claims of Class 1-B shall be paid in full, in cash, on or before the Effective Date.  Any Class 1-B Claim not allowed as of the Effective Date shall be paid as soon thereafter as it is allowed by the Court according to the terms of this Class.  This class is not impaired.

3.      **Class 1-C:  Tax Claims**

This Class consists of Allowed Priority Claims under 11 U.S.C. § 507(a)(8), which are not otherwise treated as secured claims herein.  As provided in 11 U.S.C. § 1129(a)(9)(C), unless Claimants holding Claims in this Class agree to an alternative form of treatment, the Allowed Priority Claims of Class 1-C shall be paid in full, in cash, on or before the Effective Date, or, at the Debtors' option, holders of such Allowed Claims shall be paid, on account of such Allowed Claims, deferred cash payments, over a period ending not later than five years after the date of the order for relief; and in a manner that is not less favorable than the most favored nonpriority unsecured claim provided for by the Plan (other than cash payments made to a class of creditors under section 1122(b)) equal to the allowed amount of such Claim.  Any Class 1-C Claims not allowed as of the Effective Date shall be paid as soon thereafter as they are allowed by the Court according to the terms of this Class.  This class is not impaired

2781247.1

**B.      Class 2: Allowed Post Petition Claim of Flagstaff Acquisitions, LLC**

This Class consists of the Allowed Administrative Claim of Flagstaff Acquisitions, LLC relating to the Debtors' Post-Petition Advance. The Allowed Administrative Claim of Flagstaff Acquisitions, LLC shall be paid in full, in cash, on the Effective Date, or as soon thereafter as practicable, from the Post Confirmation Credit Facility.  This class is not impaired.

**C.      Class 3: Secured Claims**

As set forth below, all holders of Allowed Secured Claims will be paid in full on their Allowed Secured Claims. The treatment of each Class of secured creditor will depend on the nature of its secured interest and the rights it may have, by contract or statute, against the Debtors.

**Class 3-A: Allowed Secured Claims of Johnson Bank**

This Class consists of the Allowed Secured Claim of Johnson Bank. This claim was secured by a first in priority lien on certain of the Debtors' real property on the date the Petition was filed. Johnson Bank also claims to be secured by certain personal property owned by the Debtors, but the Debtors have filed an avoidance action under Section 544 of the Bankruptcy Code, seeking to avoid the claimed lien on the Debtors' personal property. Subsequent to the filing of the Petition, the Court entered an order granting to Flagstaff Acquisitions, Inc., a first in priority lien on the Debtors' real property to secure the post-petition advances made to the Debtors under the terms of the Court Order approving such post-petition financing.  According to the Debtors' Schedules, the amount of Johnson Bank's secured claim as of the Petition Date was $24,275,826. Based upon the ATI Appraisal, the value of the collateral securing Johnson Bank's claim was $60,120,000.  Thus, the value of Johnson Bank's collateral exceeds the amount of its claim. Accordingly, Johnson Bank's claim is oversecured and shall accrue interest, at the Plan Rate, as of the Petition Date until such claim is paid in full.

On the Effective Date, the Debtors will sell to Johnson Bank, or the highest bidder, pursuant to Section 363 of the Bankruptcy Code, that real property described in the attached Exhibit "F." The value of the property sold, according to the ATI Appraisal, is in excess of $18.0 million.  The sale will be conducted under these terms and conditions:

18

2781247.1

1.     Johnson Bank must credit bid a minimum of $17.0 million.

2.     Other bidders may make bids, so long as the opening bid exceeds $17.0 million. Increments thereafter will be in the amount of $100,000.

3.     The sale will be advertised in newspapers of general circulation in Maricopa and Coconino Counties, as well as other media agreed upon between the Debtors and Johnson Bank, or as ordered by the Court.

4.     The Court will enter an order transferring the property free and clear of liens and interests to the highest bidder.

5.     The Court will make a finding of a good faith sale under section 363(m).

6.     Purchasers of the property sold shall be entitled to the same rights with regard to the Pine Canyon Golf Club facilities and memberships, as purchasers of the property retained by the Debtors (the "Retained Property").

7.     The property sold will remain subject to any existing covenants, conditions and restrictions.

8.     The remaining balance due and owing to Johnson Bank on its Allowed Secured Claim shall be the lesser of $8.0 million or the remaining amount after crediting the Johnson Bank claim with the high bid from the 363 sale.

The remaining obligation to Johnson Bank shall mature and become fully due and payable on the 10th anniversary of the Effective Date (the "Maturity Date"). The Debtors shall make quarterly interest only payments to Johnson Bank at the Plan Rate.  The first interest only payment will be made 90 days after the Effective Date, and each quarterly interest only payment thereafter will be made on the first business day of each subsequent quarter during the first thirty-six (36) months of the term of the obligation due to Johnson Bank.  Accrued but unpaid post petition interest shall be added to the quarterly interest payments such that the accrued but unpaid post petition interest shall be paid in full within 36 months of the Effective Date. Thereafter, quarterly principal and interest payment will be made through the Maturity Date, amortized over thirty years at the Plan Rate.  The obligation to Johnson Bank will be secured by a lien on the Retained

2781247.1

Property it claimed pre-petition (unless the lien is otherwise avoided), junior to the Post Confirmation Credit Facility.

The Johnson Bank obligation will also be paid from the proceeds of the sale of the Retained Property. Specifically, upon the sale of any portion of the Retained Property, the Net Sale Proceeds will be distributed as follows: 30% to the operating expenses of the Reorganized Debtors; 30% applied to principal and interest of the Post Confirmation Credit Facility; and 40% to principal and interest of the Johnson Bank obligation in addition to the principal and interest payments set forth in the preceding paragraph. In consideration of the distribution of these sale proceeds to Johnson Bank, Johnson Bank must release its deed of trust lien on the sold property at closing. If Johnson Bank shall fail to release its deed of trust interest, the Debtors may record the Confirmation Order and a title company may rely on such recording as a release of the Johnson Bank deed of trust lien on the property being sold.

Immediately upon payment, in full, of the Johnson Bank obligation, Johnson Bank's Allowed Secured Claim, and its secured interest in the Retained Property, will be deemed satisfied, extinguished, released and discharged, in full.

### Class 3-B: Allowed Secured Claims of Coconino County

This Class consists of the Allowed Secured Claims of the County of Coconino, Arizona ("Coconino County"), secured by tax liens on certain of the Debtors' real properties. Commencing on the Effective Date, the Allowed Secured Claims of Coconino County will be paid in equal quarterly payments of principal and interest over a term of 2 years. Interest will accrue and will be paid at the statutory rate plus 2%. The County will retain its existing secured interest in the real properties until this claim has been satisfied in full. Upon sale of such real property securing Coconino County's Allowed Secured Claims, such allowed claim shall be paid at the time of closing of the sale. This Class is impaired.

### Class 3-C: Allowed Secured Claim of GMAC Financial Services

Class 3-C consists of the Allowed Secured Claim of GMAC Financial Services ("GMAC"). This Claim is alleged to be secured by a valid and perfected lien on a 2009 GMC Sierra. The Allowed Secured Claim shall be determined by the Bankruptcy Court or agreement of

2781247.1

GMAC and the Debtors. Commencing on the Effective Date, the Allowed Secured Claim of GMAC will be paid in equal quarterly payments of principal and interest over a term of 24 months. Interest will accrue and will be paid at the Plan Rate. This Class is impaired under the Plan.

**Class 3-D: Allowed Secured Claim of Sandra K. Stevens**

Class 3-D consists of the Allowed Secured Claim of Sandra K. Stevens ("Stevens") which is secured by personal property of one or more of the Debtors. The Claim is listed in the Schedules in the approximate principal amount of $10,000. The Allowed Secured Claim of this Class shall be determined by the Bankruptcy Court or agreement of Stevens and the Debtors. Commencing on the Effective Date, the Allowed Secured Claim of Stevens will be paid in equal quarterly payments of principal and interest over a term of 12 months. Interest will accrue and will be paid at the pre-petition Note Rate. This Class is impaired under the Plan.

**Class 3-E: Allowed Secured Claim of Wespac Residential, Inc.**

This Class consists of the Allowed Secured Claim of Wespac Residential, Inc. ("Wespac"). Wespac asserts a Mechanic's Lien relating to the construction of certain real property improvements in the Elk Pass project. Wespac claims a mechanics' lien on lots 30, 45, and 46 in Elk Pass. The dispute has been in arbitration. This past week, the parties reached a tentative settlement of all claims, and are in the process of drafting a settlement agreement for court approval now. If approved, Wespac will be paid $337,500 upon entry of a final order approving the settlement, and will have an allowed secured claim in the amount of $162,500. The claim will be secured by a lien on lot 46 in Elk Pass and Wespac will release all other liens. The allowed secured claim of Wespac will be paid in full in 24 months from the Effective Date. If the settlement is not approved, the allowed claim of Wespac shall be paid in full, amortized over 15 years, with a maturity date 10 years from the date of the order allowing such claim. The Debtor shall make equal payments of principal and interest quarterly until the maturity date, at which time the remaining balance shall be paid in full.

Interest will accrue and will be paid at the Plan Rate. This Class is impaired under the Plan.

**Class 3-F: Allowed Secured Claim of General Electric Capital Corp.**

This Class consists of the Allowed Secured Claim of General Electric Capital Corp. This

2781247.1

Claim is alleged to be secured by a valid and perfected lien on certain equipment described under that certain contract no. 4431199-003. Contract no. 4431199-003 is a secured financing contract. The Allowed Secured Claim of this Class shall be determined by the Bankruptcy Court or agreement of General Electric Capital Corp. and the Debtors. Commencing on the Effective Date, the Allowed Secured Claim of General Electric Capital Corp. will be paid in accordance with the terms of the contract with the exception that monthly payments will be reduced by 10% below the monthly contract payment. This Class is impaired under the Plan.

**D.     Class 4: Allowed Claim of San Francisco Peaks Associates LP**

This Claimant asserts a claim based on an alleged agreement to transfer a Deer Creek lot in satisfaction of the claim. The value of Claimant's claim, if allowed, shall be paid in full, in equal annual payments of principal plus interest over 120 months. The first payment shall be due within 30 days of the Effective Date, or Order Allowing Claim, whichever date shall later occur.

**E.     Class 5: Allowed Unsecured Claims of Club Members holding Golf Memberships**

This Class consists of the Allowed Unsecured Claims of Club Members holding Golf Memberships ("Golf Members") arising from their right to a refund of their respective membership deposits.

The Debtors intend to assume the Membership Plan and each Golf Membership Agreement. The Debtors continue to reserve their rights under the Membership Plan and Golf Membership Agreements to, among other things, modify the Membership Plan. Notwithstanding the terms of the Membership Plan and Golf Membership Agreements, the Debtors will refund Golf Member deposits as follows:

The Golf Membership Plan as it existed pre-petition, will not be modified, except that instead of the members being entitled to a refund of their Membership Deposit in 30 years, they will receive a refund of 100% of the amount of their deposit (as it existed on the Petition Date), on the date that is 25 years after the date the membership was issued if the Golf Member does not resign within 25 years. No interest will be paid on such refund. The foregoing procedures for the refunding of membership deposits to Golf Members shall replace the deposit refunding provisions

2781247.1

in the Membership Plan and the Golf Membership Agreements.

The amount of the refund to the Golf Member shall be subject to set-off for all amounts due to the Club under the Membership Plan and/or the Golf Membership Agreement or otherwise. This Class is impaired under the Plan.

**F.     Class 6: Allowed Unsecured Claims of Club Members holding Sports Memberships**

This Class consists of the Allowed Unsecured Claims of Club Members holding Sports Memberships ("Sports Members") arising from their right to a refund of their respective membership deposits.   The Debtors intend to assume the Membership Plan and each Sports Membership Agreement.

The Debtors continue to reserve their rights under the Membership Plan and Golf Membership Agreements to, among other things, modify the Membership Plan.  Notwithstanding the terms of the Membership Plan and Sports Membership Agreements, the Debtors will refund Sports Member deposits as follows:

Sports Membership Plan as it existed pre-petition will not be modified, except that the members will receive a refund of 100% of the amount of their deposit (as it existed on the Petition Date), on the date that is 25 years after the date the membership was issued if the Sports Member does not resign within 25 years. No interest will be paid on such refund. The foregoing procedures for the refunding of membership deposits to Sports Members shall replace the deposit refunding provisions in the Membership Plan and the Sports Membership Agreements.

The amount of the refund to the Sports Member shall be subject to set-off for all amounts due to the Club under the Membership Plan and/or the Sports Membership Agreement or otherwise. This Class is impaired under the Plan.

**G.     Class 7: Allowed Unsecured Claim of Flagstaff Acquisitions, LLC**

This Class consists of the Allowed Unsecured Claim of Flagstaff Acquisitions, LLC arising from Pre-Petition Advances to the Debtors for business operations. The Claim of Flagstaff Acquisitions, LLC is listed in the Schedules in the approximate principal amount of $17,800,000. This Claim shall be determined by the Bankruptcy Court or agreement of Flagstaff Acquisitions,

23

LLC and the Debtors. The Allowed Unsecured Claim of Flagstaff Acquisitions, LLC shall be paid in full after the Allowed Secured Claim of Johnson Bank and the allowed claims of unsecured creditors have been paid in full. Interest will accrue and will be paid at the Plan Rate. This Class is impaired under the Plan.

**H.    Class 8: Allowed Unsecured Claim of O'Connor Investment Partnership**

This Class consists of the Allowed Unsecured Claim of O'Connor Investment Partnership arising from Pre-Petition Advances to the Debtors for business operations. The Claim of O'Connor Investment Partnership is listed in the Schedules in the approximate principal amount of $1,000,000. This Claim shall be determined by the Bankruptcy Court or agreement of O'Connor Investment Partnership and the Debtors. The Allowed Unsecured Claim of O'Connor Investment Partnership shall be paid in full after the Allowed Secured Claim of Johnson Bank and the allowed claims of unsecured creditors have been paid in full. Interest will accrue and will be paid at the Plan Rate. This Class is impaired under the Plan.

**I.    Class 9: Allowed General Unsecured Claims Against the Debtors**

This Class consists of the Allowed Unsecured Claims of Creditors of Debtors that are not otherwise specifically treated in this Plan. The Allowed Unsecured Claims shall be determined by the Bankruptcy Court or by agreement of the parties. Commencing on the Effective Date, the Allowed Secured Claims against the Debtors will be paid in full, in equal quarterly payments of principal and interest over a term of 18 months. Interest will accrue and will be paid at the Plan Rate. This Class is impaired under the Plan.

**J.    Class 10: Interest Holders**

This Class consists of all Allowed Interests of the Debtors. The Interest Holders of Lone Tree Investments, LLC consist of Flagstaff Acquisitions, L.L.C. and Central and Osborn Properties, Inc. Lone Tree Investments, LLC is the sole Interest Holder of Pine Canyon Golf, L.L.C., Mountain Vista at Pine Canyon, L.L.C., Elk Pass, L.L.C., Deer Creek Crossing, L.L.C. and Creekside Village Homes, LLC.

The Plan shall not alter or otherwise impair Allowed Interests of the Debtors.

2781247.1

**MEANS FOR EXECUTING THE PLAN**

### A.      Implementation and Funding

The Plan will be funded by the Post Confirmation Credit Facility from Flagstaff Acquisitions, LLC, continued operations of the golf club facilities, the sales of real estate, and sales of Club Memberships.

The Post-Confirmation Credit Facility will be extended by Flagstaff Acquisitions, L.L.C., which owns 99% of Debtor Lone Tree Investments, LLC.  Attached hereto as Exhibit "I" is a declaration of Patricia E. Nolan describing the Debtors' previous efforts to obtain financing from other parties, and opining that no party, other than Flagstaff Acquisitions, L.L.C. would be willing to extend the Post-Confirmation Credit Facility.  On the Effective Date, the Reorganized Debtors will execute loan documents for the Post Confirmation Credit Facility.  Pursuant to the loan documents, the Reorganized Debtors will issue to Flagstaff Acquisitions, L.L.C. a Revolving Line of Credit Multiple Advance Promissory Note ("Note") providing for a line of credit in an amount up to $5,000,000. The Note shall mature and become fully due and payable on the fifth anniversary of the Effective Date.  The Note shall bear interest at 15% per annum.  The Reorganized Debtors will make quarterly interest only payments to Flagstaff Acquisitions for the duration of the Note's term. The first interest only payment will be made 90 days after the Effective Date, and each quarterly payment thereafter will be made on the first business day of each subsequent quarter through to the maturity date.  Additionally, thirty percent (30%) of the net sale proceeds generated through the sale of any of the Retained Property shall be remitted to Flagstaff Acquisitions, L.L.C., to a maximum of the amount then due to Flagstaff Acquisitions, L.L.C., and applied to the outstanding balance.  Flagstaff Acquisitions will be granted a first-position lien on the Retained Property.

### B.      Retained Causes of Action.

The Debtors specifically retain all causes of action.  Any retained causes of action include, but are not limited to, all avoidance actions, fraudulent conveyance actions, preference actions, and other claims and causes of action of every kind and nature whatsoever, arising before the Effective

2781247.1

Date which have not been resolved or disposed of prior to the Effective Date, whether or not such claims or causes of action are specifically identified in the Disclosure Statement.

Any recovery obtained from retained causes of action shall become an additional asset of the Debtors, unless otherwise ordered by the Court, and shall be available for distribution in accordance with the terms of this Plan.

**C.      Management**

The Debtors will be managed by the same management team that managed the Debtors pre-petition. The Debtors' current management team was not a cause of the Debtors' financial difficulties. The Debtors' difficulties are the result of the present precipitous downturn in the market, a downturn whose depth and severity could not have been predicted. By retaining the current management team in place, the Debtors will benefit from the specific knowledge and experience of its management team. Thus, a change in management structure is not in the best interests of the Debtors or its creditors because the existing structure is appropriate to the needs of the Debtors.

**D.      Disbursing Agent**

The Reorganized Debtors shall act as the Disbursing Agent under the Plan.

**E.      Documentation of Plan Implementation**

In the event any entity which possesses an Allowed Secured Claim or any other lien in any of the Debtors' property for which the Plan requires the execution of any documents to incorporate the terms of the Plan, fails to provide a release of its lien or execute the necessary documents to satisfy the requirements of the Plan, the Debtors may record a copy of this Plan or the Confirmation Order with the appropriate governmental agency and such recordation shall constitute the lien release and creation of any necessary new liens to satisfy the terms of the Plan. If the Debtors deem advisable, they may obtain a further Order from the Court that may be recorded in order to implement the terms of the Plan.

**VIII.      EFFECT OF CONFIRMATION.**

Except as otherwise provided in the Plan or the Confirmation Order, Confirmation acts as a

2781247.1

discharge, effective as of Confirmation, of any and all debts of the Debtors that arose any time before the entry of the Confirmation Order including, but not limited to, all principal and all interest accrued thereon, pursuant to §1141(d)(1) of the Bankruptcy Code. The discharge shall be effective as to each Claim, regardless of whether a Proof of Claim thereon was filed, whether the Claim is an Allowed Claim, or whether the Holder thereof votes to accept the Plan.

## IX.    LIQUIDATION ANALYSIS

Under the Plan proposed herein, the Debtors propose to pay all Allowed Secured Claims in full, and all Allowed Unsecured Creditors in full, with interest at the Plan Rate. Consequently, all creditors will necessarily recover as much, if not more, under the Plan than they would receive in a liquidation under Chapter 7 of the Bankruptcy Code, and approval of the Plan is in the best interests of creditors.

## X.    TAX CONSEQUENCES

Pursuant to §1125(a)(1) of the Bankruptcy Code, the Debtors are to provide a discussion of the potential material tax consequences of the Plan to the Debtors, any successor to the Debtors, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant Class to make an informed judgment about the Plan. However, the Debtors need not include such information about any other possible or proposed plan. In determining whether the Disclosure Statement provides adequate information, the Court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information.

The following discussion summarizes certain considerations that may affect the anticipated federal income tax consequences of the Plan's implementation to Creditors and to the Debtors. It does not address all federal income tax consequences of the Plan nor does it address the state or local income tax or other state or local tax consequences of the Plan's implementation to Creditors or to the Debtors.

This description of the federal income tax consequences of implementing the Plan is based on Debtors' interpretation of the applicable provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), the regulations promulgated thereunder, and other relevant authority.

27

2781247.1

Debtors' interpretation, however, is not binding on the IRS or any court. The Debtors have not obtained, nor do they intend to obtain, a private letter ruling from the IRS, nor have the Debtors obtained an opinion of counsel with respect to any of these matters. The discussion below is general in nature and is not directed to the specific tax situation of any particular interested taxpayer. **For these reasons, all Creditors and the Interest Holders should consult with their own tax advisors as to the tax consequences of implementation of the Plan to them under applicable federal, state, and local tax laws.**

### A. Tax Consequences to the Debtors

In general, pursuant to IRC Section 108, the amount of any debt of a corporation that is partially or totally discharged pursuant to a Title 11 bankruptcy case is excluded from gross income. According to IRC Section 108(b), the amount of debt discharge income ("DDI") that is excluded from gross income must be applied to reduce the tax attributes of the Debtors. The Debtors' tax attributes are reduced in the following order: (1) net operating losses ("NOLs"); (2) general business credits; (3) minimum tax credit; (4) capital loss carryovers; (5) reduction in tax basis of the Debtors' property; (6) passive activity loss and credit carryovers; and (7) foreign tax credit carryovers. Here, because the Debtors are paying all creditors in full, it is not anticipated that the Debtors will have any DDI.

### B. Tax Consequences to the Secured and Unsecured Creditors

Both the Secured Claimants and/or the Unsecured Claimants may be required to report income or be entitled to a deduction as a result of implementation of the Plan. The exact tax treatment depends on, among other things, each Claimant's method of accounting, the nature of each Claimant's claim, and whether and to what extent such Claimant has taken a bad debt deduction in prior taxable years with respect to the particular debt owed to it by one of the Debtors. **Each Holder of a secured claim or an unsecured claim is urged to consult with his, her, or its own tax advisor regarding the particular tax consequences of the treatment of his, her, or its claim under the Plan.**

2781247.1

# XI.    OBJECTIONS TO AND ESTIMATIONS OF CLAIMS.

## A.    Objections and Bar Date for Filing Objections.

As soon as practicable, but in no event later than 120 days after the Effective Date, objections to Claims shall be filed with the Bankruptcy Court and served upon the holders of each of the Claims to which objections are made pursuant to the Bankruptcy Code and the Bankruptcy Rules.  Objections filed after such date will be barred.

## B.    Settlement of Claims.

Settlement of any objection to a Claim not exceeding $10,000 shall be permitted on the eleventh (11th) day after notice of the settlement has been provided to the Debtors, the Creditors, the settling party, and other persons specifically requesting such notice, and if on such date there is no written objection filed, such settlement shall be deemed approved.  In the event of a written objection to the settlement, the settlement must be approved by the Court on notice to the objecting party.

## C.    Estimation of Claims.

For purposes of making distributions provided for under the Plan, all Claims objected to shall be estimated by the Disbursing Agent at an amount equal to (i) the amount, if any, determined by the Court pursuant to §502(c) of the Bankruptcy Code as an estimate for distribution purposes; (ii) an amount agreed to between the Debtors and the Claimant; or, (iii) that amount set forth as an estimate in the Plan or Disclosure Statement.  Notwithstanding anything herein to the contrary, no distributions shall be made on account of any Claim until such Claim is an Allowed Claim.

## D.    Unclaimed Funds and Interest.

Distribution to Claimants shall be mailed by the Reorganized Debtors to the Claimants at the address appearing on the master mailing matrix unless the Claimant provides the Reorganized Debtors with an alternative address.  After a period of one year from the date that a distribution was made by the disbursing agent but has gone uncollected by the Claimant, the disbursing agent shall retain any distributions otherwise distributable hereunder which remain unclaimed or as to which

2781247.1

the disbursing agent has not received documents required pursuant to the Plan. Thereafter, the unclaimed funds shall revest in the Reorganized Debtors.

### XII. NON-ALLOWANCE OF PENALTIES AND FINES.

No distribution shall be made under the Plan on account of, and no Allowed Claim, whether Secured, Unsecured, Administrative, or Priority, shall include any fine, penalty, exemplary or punitive damages, late charges, default interest or other monetary charges relating to or arising from any default or breach by any of the Debtors, and any Claim on account thereof shall be deemed Disallowed, whether or not an objection was filed to it.

### XIII. CLOSING OF CASE.

If the Court does not close these cases on its own motion, the Reorganized Debtors will move the Court to close the cases once the Plan is deemed substantially consummated. Until substantial consummation, the Reorganized Debtors will be responsible for filing pre- and post-confirmation reports required by the United States Trustee and paying the quarterly post-confirmation fees of the United States Trustee, in cash, pursuant to 28 U.S.C. §1930, as amended. Pursuant to 11 U.S.C. §1129(a)(12), all fees payable under Section 1930 of Title 28, as determined by the Court at the hearing on confirmation of the Plan, will be paid, in cash, on the Effective Date.

### XIV. MODIFICATION OF THE PLAN.

In addition to its modification rights under §1127 of the Bankruptcy Code, the Debtors may amend or modify the Plan at any time prior to Confirmation without leave of the Court. The Debtors may propose amendments and/or modifications of the Plan at any time subsequent to Confirmation with leave of the Court and upon notice to Creditors. After Confirmation of the Plan, the Debtors may, with approval of the Court, as long as it does not materially or adversely affect the interests of Creditors, remedy any defect or omission or reconcile any inconsistencies of the Plan, or in the Confirmation Order, if any may be necessary to carry out the purposes and intent of the Plan.

### XV. JURISDICTION OF THE COURT.

The Court will retain jurisdiction until the Plan has been fully consummated for, including

2781247.1

but not limited to, the following purposes:

1. The classification of the Claims of any Creditors and the re-examination of any Claims which have been allowed for the purposes of voting, and for the determination of such objections as may be filed to the Creditor's Claims. The failure by the Debtors to object to or examine any Claim for the purpose of voting shall not be deemed to be a waiver of the Debtors' rights to object to or to re-examine the Claim in whole or in part.

2. To determine any Claims which are disputed by the Debtors, whether such objections are filed before or after Confirmation, to estimate any Un-liquidated or Contingent Claims pursuant to 11 U.S.C. § 502(c)(1) upon request of the Debtors or any holder of a Contingent or Un-liquidated Claim, and to make determination on any objection to such Claim.

3. To determine all questions and disputes regarding title to the assets of the Estate, and determination of all causes of action, controversies, disputes or conflicts, whether or not subject to action pending as of the date of Confirmation, between the Debtors and any other party, including but not limited to, any rights of the Debtors to recover assets pursuant to the provisions of the Bankruptcy Code.

4. The correction of any defect, the curing of any omission or any reconciliation of any inconsistencies in the Plan, or the Confirmation Order, as may be necessary to carry out the purposes and intent of the Plan.

5. The modification of the Plan after Confirmation, pursuant to the Bankruptcy Rules and the Bankruptcy Code.

6. To enforce and interpret the terms and conditions of the Plan.

7. The entry of an order, including injunctions, necessary to enforce the title, rights and powers of the Debtors, and to impose such limitations, restrictions, terms and conditions of such title, right and power that this Court may deem necessary.

8. The entry of an order concluding and terminating this case.

## XVI.   RETENTION AND ENFORCEMENT OF CLAIMS.

Pursuant to §1123(b)(3) of the Bankruptcy Code, the Reorganized Debtors shall retain and

2781247.1

may enforce any and all claims of the Debtors, except those claims specifically waived herein. Any retained causes of action include, but are not limited to, all avoidance actions, fraudulent conveyance actions, preference actions, and other claims and causes of action of every kind and nature whatsoever, arising before the Effective Date which have not been resolved or disposed of prior to the Effective Date, whether or not such claims or causes of action are specifically identified in the Disclosure Statement.

Any recovery obtained from retained causes of action shall become an additional asset of the Debtors, unless otherwise ordered by the Court, and shall be available for distribution in accordance with the terms of the Plan.

## XVII. EXECUTORY CONTRACTS.

The Debtors assume all executory contracts and unexpired leases not otherwise rejected by separate order of the Court as of the Confirmation Date. Claims under § 502(g) of the Code arising as a result of the rejection of executory contracts or unexpired leases shall be filed no later than 30 days after the Confirmation Date. Any such Claims not timely filed and served shall be disallowed.

## XVIII. REVESTING.

Except as provided for in the Plan or in the Confirmation Order, on the Effective Date the Reorganized Debtors shall be vested with all the property of the Estate free and clear of all claims, liens, charges, and other interests of Creditors, arising prior to the Effective Date. Upon the Effective Date, the Reorganized Debtors shall operate their business free of any restrictions.

## XIX. DISCLAIMER.

Court approval of this Joint Disclosure Statement and the accompanying Joint Plan of Reorganization, is not a certification of the accuracy of the contents thereof. Furthermore, Court approval of these documents does not constitute the Court's opinion as to whether the Plan should be approved or disapproved.

## XX. RISKS.

The risk of the Plan lies with the Debtors' ability to fund the Plan. If the funds to be infused by the Post Confirmation Credit Facility are infused, this will lessen the risk accordingly.

2781247.1

However, the success of the Debtors depends in large part on the recovery of the national economy over the next several years following confirmation. The principal risk associated with the Plan is the health of the national economy as a whole, and more specifically, in the housing market in Coconino and the surrounding counties. Expectations are that the present recession will give way to economic growth in the foreseeable future. As that growth occurs, demand for housing will increase, as will housing prices and net sales.

However, if the economy should suffer a substantial further decline in the near to mid term, the result could be a further decline in demand for homes. However, this risk is mitigated because it would likely mean that the Unsecured Creditors would still be repaid, only over a longer term. Nonetheless, as with any business, the markets are unpredictable, and although the Debtors are confident they can succeed under the Plan, they cannot guarantee success.

## XXI.   PROPONENTS RECOMMENDATION/ALTERNATIVES TO THE PLAN.

The Debtors recommend that all creditors entitled to vote for the Plan do so. The Debtors' Plan proposes to pay all Allowed Secured and Allowed Unsecured Claims in full. The alternatives to confirmation of the Plan would be either conversion of these cases to cases under Chapter 7 of the Bankruptcy Code or a dismissal of the cases.

Conversion of these cases to Chapter 7 will result in the liquidation of the Debtors' assets, at liquidation prices. It will also result in the appointment of a Chapter 7 trustee and, most likely, the hiring of an attorney by the trustee. Expenses incurred in administering the Chapter 7 cases would take priority in the right to payment over allowed, administrative expenses incurred in the Chapter 11 cases.  Both Chapter 7 and Chapter 11 administrative expenses take priority over the payment of general unsecured claims. Also, because the Debtors' assets will be subject to liquidation under "fire sale" conditions, it will generate substantially less cash for the payment of creditors than a reorganization under the terms of the Plan.  In other words, conversion would likely decrease the net amount available to pay currently existing creditors.

For these reasons, the Debtors urge you to vote to accept the Plan and to return your ballots in time to be counted.

2781247.1

DATED: January 24, 2011.

POLSINELLI SHUGHART PC

By: _____
    John J. Hebert
    Mark W. Roth
    Mary B. Martin
    Wesley D. Ray
    CityScape Plaza
    One E. Washington, Suite 1200
    Phoenix, AZ 85004

*Attorneys for Debtors*

LONE TREE INVESTMENTS, LLC
By: Central and Osborn Properties, Inc.,
its Manager

By: _____
    Patricia E. Nolan
    Its President

**COPY** of the foregoing mailed (or served via electronic notification if indicated by an "*") on January 24, 2011, to:

U.S. TRUSTEE'S OFFICE
230 N. 1st Avenue, Suite 204
Phoenix, AZ 85003

Joseph E. Cotterman * jec@gknet.com
James B. Connor jbc@gknet.com
GALLAGHER & KENNEDY P.A.
2575 E. Camelback Road, Suite 1100
Phoenix, AZ 85016-9225
*Attorneys for Johnson Bank*

Scott K. Brown * sbrown@LRLaw.com
J. Henk Taylor * htaylor@lrlaw.com
Robert R. Roos * rroos@LRLaw.com
LEWIS AND ROCA LLP
40 N. Central Ave., Suite 1900
Phoenix, AZ 85004-4429
*Attorneys for Wespac Communities, Inc.*

GE Money Bank  claims@recoverycorp.com
c/o RECOVERY MANAGEMENT SYSTEMS CORP.
25 SE 2nd Avenue, Suite 1120
Miami, FL 33131-1605
Attn: Ramesh Singh

By: *_/s/ Mary A. Shultz_*

34

2781247.1

# EXHIBIT A

**Real property legally or beneficially owned by Lone Tree Investments, LLC**

Parcel A: Unit 61 and Tracts 1, A, B, E, F, G, H, J, K, L, M, N, Q, T, 6, 7, 13, 15A, 15B, 17A, 17B, 18A, 19A, 19B, 20A, 20B, 20C, 20D, 20E, 20F, 20G, 22, 23 & 25, THE ESTATES AT PINE CANYON UNIT ONE, according to the plat of record in Case 8, Map 92, records of Coconino County, Arizona.

Parcel B: Tracts C, D, & 16A, THE ESTATES AT PINE CANYON UNIT ONE, according to the plat of record in Case 8, Map 92, records of Coconino County, Arizona. EXCEPTING THEREFROM any portion that has been re-subdivided into the AMENDED FINAL PLAT OF MOUNTAIN VILLAS AT PINE CANYON.

Parcel C: Tract 9, THE ESTATES AT PINE CANYON UNIT ONE, according to the plat of record in Case 8, Map 92, records of Coconino County, Arizona. EXCEPTING THEREFROM any portion that has been re-subdivided into THE ESTATES AT PINE CANYON UNIT 2.

Parcel D: Tracts 8A, 8B, 8C, 10A, 11A, & 12A, THE ESTATES AT PINE CANYON UNIT TWO, according to the plat recorded in Case 9, Map 28, records of Coconino County, Arizona.

Parcel E: Tracts 4A, 4B & 4C, THE ESTATES AT PINE CANYON UNIT THREE, according to the plat recorded in Case 9, Map 59, records of Coconino County, Arizona.

Parcel F: Lots 257, 258, 260, 261, 262, 265, 266, 270, 272, 273, 274, 275, 278 through 291, inclusive, 293, 295, 297, 298, 300 through 306, inclusive, 309, 311 & 312, THE ESTATES AT PINE CANYON UNIT FOUR, according to the plat recorded in Instrument No. 3393728, records of Coconino County, Arizona.

Parcel G: Tracts 4D, 4E, 4F, 5A, 5B, 5C & 5D, THE ESTATES AT PINE CANYON UNIT FOUR, according to the plat recorded in Instrument No. 3393728, records of Coconino County, Arizona.

# *EXHIBIT B*

**Real property legally or beneficially owned by Creekside Village Homes, LLC**

Parcel A: Tracts 24B, 24C, 24D, & 24E, MOUNTAIN ESTATES UNIT ONE AT PINE CANYON, according to the plat recorded in Case 9, Map 22, records of Coconino County, Arizona.

Parcel B: Tracts 14A, 14B, 14C, 14D, 14E, 14F, 14G, 14H, 14J, 14K, 14L & 14M, MOUNTAIN ESTATES UNIT TWO AT PINE CANYON, according to the plat recorded in Case 9, Map 71, records of Coconino County, Arizona.

# *EXHIBIT C*

**Real property legally or beneficially owned by Deer Creek Crossing, L.L.C.**

Parcel A: Tracts 3A, 3B, 3C, 3D, 3E & 3F, FINAL PLAT OF DEER CREEK CROSSING UNIT ONE AT PINE CANYON, according to the plat recorded in Instrument No. 3450516, records of Coconino County, Arizona.

Parcel B: Lots 1-26, inclusive, and Lots 34-38, inclusive, FINAL PLAT OF DEER CREEK CROSSING UNIT ONE AT PINE CANYON, according to the plat recorded in Instrument No. 3450516, records of Coconino County, Arizona.

Parcel C: Lots 1-11, inclusive, THE CABINS UNIT ONE AT DEER CREEK CROSSING, according to the plat recorded in Instrument No. 3546721, records of Coconino County, Arizona (being a resubdivision of Lots 27 through 33 of FINAL PLAT OF DEER CREEK CROSSING UNIT ONE AT PINE CANYON, according to the plat recorded in Instrument No. 3450516, records of Coconino County, Arizona).

# *EXHIBIT D*

**Real property legally or beneficially owned by Elk Pass, L.L.C.**

Parcel A: Lots 1-6, inclusive, Lots 11, 15, & 16, and Lots 31-42, inclusive, AMENDED FINAL PLAT OF MOUNTAIN VILLAS AT PINE CANYON, according to the plat recorded in Instrument No. 3416358, record of Coconino County, Arizona.

Parcel B: Lots 18, 29 & 46, AMENDED FINAL PLAT OF MOUNTAIN VILLAS AT PINE CANYON, according to the plat recorded in Instrument No. 3416358, records of Coconino County, Arizona.

Parcel C: Tracts 21A & 21B, AMENDED FINAL PLAT OF MOUNTAIN VILLAS AT PINE CANYON, according to the plat recorded in Instrument No. 3416358, record of Coconino County, Arizona.

# *EXHIBIT E*

**Real property legally or beneficially owned by Mountain Vista at Pine Canyon, L.L.C.**

Parcel A: Units 1, 2, 7, 9 through 54, inclusive, and 57 through 60, inclusive, FINAL PLAT OF MOUNTAIN VISTA CONDOMINIUM AT PINE CANYON, according to the plat recorded in Instrument No. 3430465, records of Coconino County, Arizona.

Parcel B: Tracts 24G & 24F, FINAL PLAT OF MOUNTAIN VISTA CONDOMINIUM AT PINE CANYON, according to the plat recorded in Instrument No. 3430465, records of Coconino County, Arizona.

# *EXHIBIT F*

Lots 9-52 and 57-60, Final Plat of Mountain Vista Condominium at Pine Canyon, according to the plat recorded in instrument no. 3430465, records of Coconino County, Arizona.

Tract 3F, FINAL PLAT OF DEER CREEK CROSSING UNIT ONE AT PINE CANYON, according to the plat recorded in Instrument No. 3450516, records of Coconino County, Arizona.

Tracts 6, 7, 22 and 23, the Estates at Pine Canyon Unit One, according to the plat of record in Case 8, Map 92, records of Coconino County, Arizona.

Tract 9, The Estates at Pine Canyon Unit One, according to the plat of record in Case 8, Map 92, records of Coconino County, Arizona excepting therefrom any portion that has been re-subdivided into the Estates at Pine Canyon Unit two.

# EXHIBIT G

**LONE TREE INVESTMENTS, LLC & SUBSIDIARIES**
Chapter 11 Reorganization Plan
November 30, 2010

| | Nov-10 | Dec-10 | Jan-11 | Feb-11 | Mar-11 | Apr-11 | May-11 | Jun-11 | Jul-11 | Aug-11 | Sep-11 | Oct-11 | Nov-11 | Dec-11 | Total 2011 | Total 2012 | Total 2013 | Total 2014 | Total 2015 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Golf Shop | (12) | (12) | (9) | (9) | (10) | (14) | (12) | (12) | (10) | (10) | (9) | (10) | (14) | (14) | (133) | (130) | (127) | (124) | (122) |
| Food & Beverage | (17) | (17) | (17) | (17) | (19) | (25) | (29) | (29) | (29) | (29) | (25) | (20) | (17) | (17) | (273) | (269) | (263) | (258) | (253) |
| Health & Fitness | (2) | (2) | (1) | (1) | (1) | (1) | 1 | 3 | 5 | 5 | 2 | 1 | (1) | (1) | 11 | 12 | 13 | 14 | 15 |
| Clubhouse | (45) | (40) | (40) | (40) | (40) | (50) | (60) | (60) | (50) | (50) | (50) | (50) | (40) | (40) | (525) | (536) | (552) | (569) | (596) |
| Camp Pine Canyon | (4) | (4) | (4) | (3) | (4) | (6) | (17) | (17) | (17) | (15) | (6) | 0 | (3) | (4) | (99) | (97) | (95) | (93) | (91) |
| CPC Snack Bar | 0 | 0 | 0 | 0 | 0 | 0 | (1) | 1 | 1 | 0 | (1) | 0 | 0 | 0 | 1 | 1 | 3 | 5 | 7 |
| Membership Services Revenue | 95 | 95 | 508 | 115 | 115 | 115 | 115 | 115 | 115 | 115 | 115 | 115 | 115 | 115 | 1,773 | 1,808 | 1,898 | 1,936 | 2,033 |
| Membership Services Expenses | (4) | (12) | (3) | (10) | (3) | (11) | (29) | (10) | (8) | (21) | (4) | (4) | (3) | (3) | (128) | (131) | (134) | (137) | (140) |
| Golf Course Maintenance | (80) | (70) | (41) | (40) | (41) | (135) | (140) | (140) | (140) | (140) | (140) | (125) | (62) | (58) | (1,202) | (1,226) | (1,251) | (1,276) | (1,302) |
| Administration without depreciation | (37) | (33) | (29) | (29) | (29) | (40) | (32) | (37) | (32) | (32) | (32) | (42) | (29) | (27) | (392) | (400) | (409) | (416) | (424) |
| **TOTAL PINE CANYON GOLF OPERATING LOSS** | (106) | (95) | 409 | (34) | (32) | (167) | (204) | (186) | (165) | (177) | (153) | (138) | (54) | (67) | (968) | (967) | (916) | (918) | (863) |
| LTI Operating Exp. w/o depreciation & Prop Taxes | (125) | (110) | (89) | (86) | (89) | (280) | (90) | (86) | (86) | (86) | (85) | (274) | (83) | (83) | (1,417) | (1,441) | (1,460) | (1,474) | (1,488) |
| LTI City of Flagstaff Reclaimed Water Payment | 0 | 0 | 0 | 107 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 107 | 107 | 0 | 0 | 0 |
| HOA Subsidy | (10) | (40) | 0 | 0 | (15) | 0 | 0 | (7) | 0 | 0 | (7) | 0 | 0 | (6) | (35) | (36) | (37) | (38) | (39) |
| Creekside Operating Expenses & Prop Taxes | (1) | 0 | 0 | (1) | 0 | (1) | (3) | (1) | 0 | (1) | (3) | (1) | 0 | (1) | (6) | (6) | (1) | (1) | (1) |
| Elk Pass Operating Exp., Prop Taxes & Prop Taxes | (30) | (35) | (30) | (18) | (6) | (25) | (3) | (3) | (3) | (3) | (3) | (20) | (2) | (2) | (116) | (60) | (55) | (55) | (51) |
| Mtn Vista Operating Exp., Prop Taxes & Loan Reqpts | (2) | (2) | (2) | 356 | (2) | (22) | (2) | (1) | (1) | (1) | (1) | (21) | (2) | (2) | 298 | (10) | 0 | 0 | 0 |
| Deer Creek Crossing Operating Exp. & Prop Taxes | (2) | (2) | (2) | (1) | (2) | (36) | (1) | (2) | (2) | (2) | (2) | (35) | (1) | (2) | (86) | (88) | (87) | (86) | (85) |
| Deer Creek Crossing Model Cabin | (40) | (40) | (40) | (50) | (45) | (45) | (40) | (40) | (40) | (60) | (40) | 0 | 0 | 0 | (380) | 0 | 0 | 0 | 0 |
| Pine Canyon Realty Net Loss | (15) | (15) | (15) | (15) | (15) | (15) | (18) | (10) | (5) | (10) | (7) | (15) | (15) | (15) | (130) | (105) | (85) | (65) | (50) |
| Capital Equip.& Deer Creek Infrastructure (2012) | (5) | (5) | 0 | 0 | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | 0 | (5) | (50) | (200) | (100) | (150) | (200) |
| **CASH REQUIREMENT WITH NO SALES** | (336) | (344) | 231 | 238 | (215) | (596) | (363) | (320) | (303) | (345) | (263) | (509) | (157) | (181) | (2,783) | (2,806) | (2,741) | (2,787) | (2,777) |
| **NET PROCEEDS REAL ESTATE SALES** | | | | | | | | | | | | | | | | | | | |
| LTI Specs and Lots (Resale in 2010) | 600 | 0 | 0 | 0 | 0 | 0 | 0 | 1,740 | 275 | 175 | 0 | 275 | 0 | 0 | 2,465 | 5,650 | 1,350 | 1,920 | 2,000 |
| Elk Pass Specs | 0 | 0 | 0 | 0 | 0 | 460 | 450 | 0 | 0 | 740 | 390 | 0 | 0 | 0 | 2,040 | 0 | 0 | 0 | 600 |
| Mtn Vista Specs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 840 | 410 | 0 | 0 | 0 | 0 | 0 | 1,250 | 0 | 0 | 0 | 0 |
| Deer Creek Crossing Lots/Homes | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 510 | 1,010 | 1,850 | 2,520 |
| Membership Deposits accompanying R.E. Sales | 0 | 0 | 0 | 0 | 0 | 60 | 0 | 70 | 10 | 60 | 0 | 10 | 0 | 0 | 210 | 120 | 200 | 390 | 460 |
| **TOTAL NET PROCEEDS REAL ESTATE SALES** | 600 | 0 | 0 | 0 | 0 | 520 | 450 | 2,650 | 695 | 975 | 390 | 285 | 0 | 0 | 5,965 | 6,280 | 2,560 | 4,160 | 5,580 |
| **REORGANIZATION CASH FLOWS** | | | | | | | | | | | | | | | | | | | |
| Bank Loan Interest | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (98) | 0 | 0 | (88) | 0 | 0 | (86) | (272) | (433) | (358) | (153) | (34) |
| Pre-Petition Trade Payables | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (224) | (352) | 0 | 0 | 0 |
| Pre-Petition Property Taxes | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (16) | (16) | (16) | (16) | (16) | (16) | (16) | (112) | (192) | (80) | 0 | 0 |
| Bank Loan Principal Repayment | 0 | 0 | 0 | 0 | 0 | (184) | (180) | (984) | (274) | (366) | (118) | (110) | 0 | 0 | (2,216) | (2,231) | (786) | (1,405) | (1,362) |
| Stevens Loan Repayment | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (7) | (5) | 0 | 0 | 0 |
| FAL Financing and Repayment | 0 | 0 | 0 | 0 | 0 | 100 | 100 | (204) | 0 | 0 | 0 | 0 | 0 | 0 | (4) | 0 | 1,000 | 200 | (1,450) |
| **TOTAL REORGANIZATION CASH FLOWS** | 0 | 0 | 0 | 0 | 0 | (84) | (80) | (1,335) | (323) | (415) | (255) | (159) | (49) | (135) | (2,835) | (3,213) | (224) | (1,358) | (2,846) |

**LONE TREE INVESTMENTS, LLC & SUBSIDIARIES**
Chapter 11 Reorganization Plan
November 30, 2010

| | Nov-10 | Dec-10 | Jan-11 | Feb-11 | Mar-11 | Apr-11 | May-11 | Jun-11 | Jul-11 | Aug-11 | Sep-11 | Oct-11 | Nov-11 | Dec-11 | Total 2011 | Total 2012 | Total 2013 | Total 2014 | Total 2015 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NET CASH INCREASE / (DECREASE) | 264 | (344) | 231 | 238 | (215) | (160) | 7 | 995 | 69 | 215 | (128) | (383) | (206) | (316) | 267 | 261 | (405) | 15 | (43) |
| CUMULATIVE CASH INCREASE | | (80) | 151 | 389 | 174 | 14 | 21 | 1,016 | 1,085 | 1,300 | 1,172 | 789 | 583 | 267 | 267 | 528 | 123 | 138 | 95 |

## SALES ASSUMPTIONS

| | 2011 | 2012 | 2013 | 2014 | 2015 | Total | Remaining |
|---|---|---|---|---|---|---|---|
| LTI Spec Homes @ various prices | 1 | 2 | | | | 3 | 0 |
| LTI Lots @ various prices | 3 | 2 | 6 | 8 | 8 | 27 | 9 |
| Elk Pass Specs and Homes @ various prices | 3 | | | | 2 | 5 | 18 |
| Mountain Vista Specs @ various prices | 3 | | | | | 3 | 0 |
| Deer Creek Crossing Cabins @ $170k net each | | 3 | 3 | 5 | 6 | 17 | 13 |
| Deer Creek Crossing Residences @ $250k net each | | | 2 | 4 | 6 | 12 | |
| **TOTAL SALES** | 10 | 7 | 11 | 17 | 22 | 67 | 40 |
| Memberships - Golf @ $60k each | 4 | 3 | 5 | 8 | 9 | 29 | |
| Memberships - Sports @ $10k each | 3 | 1 | 3 | 5 | 6 | 18 | |
| Membership Refunds - Golf   due every 4th issued | 1 | 1 | 2 | 2 | 2 | | |
| Membership Refunds - Sports   due every 4th issued | | | 1 | 2 | 2 | | |

## PRIMARY ASSUMPTIONS

- Increase golf member dues 20% in 2011 from $625 / mo to $750 / month, then approx 5% increase in 2013 and 5% in 2015
- Increase sports member dues 15.7% in 2011 from $255/mo to $295/mo, then approx 5% increase in 2013 and 5% in 2015
- Eliminate dining room hours Jan-Mar (except a few weekends) and reduce hours at beginning and end of season
- Open golf course May 15th and close October 15th (was May 1 to Nov 1)
- Pine Canyon Master Builders eliminated
- Increase HOA dues 18.6% in 2011 from $480 / qtr to $570 / qtr, then approx 3% increase in future years
- Increase Elk Pass HOA dues 18.2% in 2011 from $330/qtr to $390/qtr, then approx 4% increase in future years
- Increase Mtn Vista HOA dues 15% in 2011 from $300/qtr to $345/qtr, then approx 4% increase in future years
- Real Estate Sales will continue in spite of the filing and economy.  We have closed 3 sales in the last 3 months and have 2 more in escrow.
  The astute buyer recognizes the value of the amenities, including the Award-winning Clubhouse and Camp Pine Canyon recreation center,
  consisting of 3 pools, a waterslide, tennis courts, and a children's clubhouse with food service, along with a Championship 18 hole course.
  The golf course, ranked 4th best in the State by Golf Digest is the centerpiece of the Community.  With over 400 lots sold buyers feel confident
  that Pine Canyon will continue to be one of the finest Mountain Communities in the County.

## ADDITIONAL ASSUMPTIONS

- Revenue generating club departments are forecasted to remain fairly flat, with increased revenues due to new members offset by increased costs
- Clubhouse department will have increasing costs, due primarily to utilities and repairs & maintenance (but trying to do more of r&m with staff)
- Other "overhead" departments should just see costs increasing at an assumed rate of 2% per year
- LTI assumed 2% per year cost increases offset somewhat by reductions in property taxes as lots are sold
- HOA subsidies remained relatively flat, as increases in dues would be offset by increases to reserves
- Elk Pass outflows will primarily be property taxes once specs are sold
- Mountain Vista will decrease as specs are sold, and then assumed to be eliminated once turned over to bank
- Deer Creek Crossing will have model expenses ($460k total outlay for model and furnishings)  and property taxes that will decrease as lots are sold
- Capital Equipment - Budgeted $50k to only do necessary computer and other equipment replacements, increasing over the forecasted period
- Bank Loan interest based on 5% of $8 million, quarterly interest payments to begin in June 2011 paying post petition interest to March 2011 over 36 months
- Bank Loan principal repayment to begin in March 2011 based on 40% of net proceeds of real estate sales
- Pre-petition property taxes payments to begin June 2011 and paid over 24 months at 18% interest
- Pre-petition unsecured payables payments to begin June 2011 and paid over 18 months at 5% interest

# EXHIBIT G

**LONE TREE INVESTMENTS, LLC & SUBSIDIARIES**
Chapter 11 Reorganization Plan
November 30, 2010

| | Nov-10 | Dec-10 | Jan-11 | Feb-11 | Mar-11 | Apr-11 | May-11 | Jun-11 | Jul-11 | Aug-11 | Sep-11 | Oct-11 | Nov-11 | Dec-11 | Total 2011 | Total 2012 | Total 2013 | Total 2014 | Total 2015 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

- Stevens loan payments to begin June 2011 and paid over 12 months at 8% interest
- FAL $5 million post-confirmation loan available in subsequent years if needed with quarterly interest-only payments at 15% interest, 30% of net proceeds of R.E. sales pay principal
- Outcome of arbitration and any other legal issues uncertain, so not taken into account

# *EXHIBIT H*

## SECTION ONE (1-A)

Based upon the information found in our investigation, coupled with our analysis and by virtue of our experience, it is our opinion that the current market value of the subject property (Golf Course/clubhouse and associated property) as a "going concern," as of May 6, 2010, was:

> **ELEVEN MILLION THREE HUNDRED FIVE THOUSAND DOLLARS**
> **($11,305,000.00)**

The above value is inclusive of all Furniture Fixtures and Equipment (FF&E) estimated at $1,803,500.

## SECTION ONE (1-B)

Based upon the information found in our investigation, coupled with our analysis and by virtue of our experience, it is our opinion that the current "bulk" market value of subject property (36 finished custom home lots within *The Estates),* as of May 6, 2010, was:

> **SEVEN MILLION SIX HUNDRED TWENTY THOUSAND DOLLARS**
> **($7,620,000.00)**

## SECTION TWO (2)

Based upon the information found in our investigation, coupled with our analysis and by virtue of our experience, it is our opinion that the current "bulk" market value of subject property (31 finished semi-custom home lots with an additional 11 semi-custom cabin home lots within *Deer Creek Crossing),* as of May 6, 2010, was:

> **FOUR MILLION FIVE HUNDRED FIFTY THOUSAND DOLLARS**
> **($4,550,000.00)**

## SECTION THREE (3)

Based upon the information found in our investigation, coupled with our analysis and by virtue of our experience, it is our opinion that the current "bulk" market value of subject property (22 finished town-home lots within the *Mountain Villas at Elk Pass),* as of May 6, 2010, was:

> **TWO MILLION FOUR HUNDRED SIXTY THOUSAND DOLLARS**
> **($2,460,000.00)**

# *EXHIBIT H*

## SECTION FOUR (4)

Based upon the information found in our investigation, coupled with our analysis and by virtue of our experience, it is our opinion that the current market value of the remaining land (10.91 ± acres or 475,540 ± square feet) allocated to the 12 undeveloped condominium pads (48 units) within the Mt. Vista Condominiums at Pine Canyon, was:

> ### THREE MILLION NINETY THOUSAND DOLLARS
> ### ($3,090,000.00)

## SECTION FIVE (5)

**(5-A)** Based upon the information found in our investigation, coupled with our analysis and by virtue of our experience, it is our opinion that the current market value of subject property (27.45 ± acres denoted as Tracts "6 & 7" and platted and engineered for 47 custom home lots within *The Estates Unit "5"),* as of May 6, 2010, was:

> ### FIVE MILLION ONE HUNDRED THOUSAND DOLLARS
> ### ($5,100,000.00)

**(5-B)** Based upon the information found in our investigation, coupled with our analysis and by virtue of our experience, it is our opinion that the current market value of subject property (17.50 ± acres denoted as Tract "9" and platted and engineered for 38 custom home lots within *The Estates),* as of May 6, 2010, was:

> ### TWO MILLION FIVE HUNDRED THIRTY THOUSAND DOLLARS
> ### ($2,530,000.00)

**(5-C)** Based upon the information found in our investigation, coupled with our analysis and by virtue of our experience, it is our opinion that the current market value of subject property (21.10 ± acres denoted as Tract "3-F" and preliminarily platted for 70 lots/units within *Deer Creek Crossing* - to be comprised of 22 duplex/triplex units in the "North" and 48 cottage lots in the "South"*),* as of May 6, 2010, was:

> ### THREE MILLION NINE HUNDRED FIVE THOUSAND DOLLARS
> ### ($3,905,000.00)

# EXHIBIT H

**(5-D)** Based upon the information found in our investigation, coupled with our analysis and by virtue of our experience, it is our opinion that the current market value of subject property (7.87 ± acres denoted as Tract "23" and preliminarily platted for 20 duplex units - 10 buildings), as of May 6, 2010, was:

> ## ONE MILLION THREE HUNDRED SEVENTY THOUSAND DOLLARS
> ## ($1,370,000.00)

## SECTION SIX (6)

**(6-A)** Based upon the information found in our investigation, coupled with our analysis and by virtue of our experience, it is our opinion that the current market value of subject property (15.64 ± acres of un-entitled multi-family zoned land denoted as Tract "22" within Pine Canyon), as of May 6, 2010, was:

> ## TWO MILLION ONE HUNDRED TEN THOUSAND DOLLARS
> ## ($2,110,000.00)

**(6-B)** Based upon the information found in our investigation, coupled with our analysis and by virtue of our experience, it is our opinion that the current market value of subject property (2.68 ± acres of land to be appraised "as vacant" and denoted as "Tract 1", as of May 6, 2010, was:

> ## FIVE HUNDRED TWENTY FIVE THOUSAND DOLLARS
> ## ($525,000.00)

**Again, it should be noted, each value is considered a stand alone value; <u>no</u> discounting for a bulk sales value has been indicated.**

Section One (1) through Section Six (6) were appraised by Jeff W. Windle, GAA and Kyle R. Wood, Independent Fee Appraiser and the values, discussions and conclusions related to these Sections and only these Sections, are our own.

Respectfully submitted,

Jeff W. Windle, GAA
Certified General Real Estate Appraiser No. 30808

Kyle Wood, Independent Fee Appraiser
Certified General Real Estate Appraiser No. 31662

# *EXHIBIT H*

## SECTION SEVEN (7)

**(7-A)** Based upon the information found in our investigation, coupled with our analysis and by virtue of our experience, it is our opinion that the current market value of the subject property (Custom Single Family Home on Lot 302 within *The Estates*), as of May 6, 2010, was:

> **ONE MILLION FIVE HUNDRED FIFTY THOUSAND DOLLARS**
> **($1,550,000.00)**

**(7-B)** Based upon the information found in our investigation, coupled with our analysis and by virtue of our experience, it is our opinion that the current market value of the subject property (Custom Single Family Home on Lot 286 within *The Estates*), as of May 6, 2010, was:

> **TWO MILLION EIGHT HUNDRED THOUSAND DOLLARS**
> **($2,800,000.00)**

**(7-C)** Based upon the information found in our investigation, coupled with our analysis and by virtue of our experience, it is our opinion that the current market value of the subject property (Custom Single Family Home on Lot 293 within *The Estates*), as of May 6, 2010, was:

> **THREE MILLION FIVE HUNDRED THOUSAND DOLLARS**
> **($3,500,000.00)**

## SECTION EIGHT (8)

**(8-A)** Based upon the information found in our investigation, coupled with our analysis and by virtue of our experience, it is our opinion that the current market value of the subject property (Townhome on Lot 11 within The *Mountain Villas at Elk Pass*), as of May 6, 2010, was:

> **ONE MILLION SEVENTY FIVE THOUSAND DOLLARS**
> **($1,075,000.00)**

# *EXHIBIT H*

**(8-B)** Based upon the information found in our investigation, coupled with our analysis and by virtue of our experience, it is our opinion that the current market value of the subject property (Townhome on Lot 18 within The *Mountain Villas at Elk Pass*), as of May 6, 2010, was:

> ### FIVE HUNDRED EIGHTY FIVE THOUSAND DOLLARS
> ### ($585,000.00)

**(8-C)** Based upon the information found in our investigation, coupled with our analysis and by virtue of our experience, it is our opinion that the current market value of the subject property (Townhome on Lot 24 within The *Mountain Villas at Elk Pass*), as of May 6, 2010, was:

> ### SEVEN HUNDRED TEN THOUSAND DOLLARS
> ### ($710,000.00)

**(8-D)** Based upon the information found in our investigation, coupled with our analysis and by virtue of our experience, it is our opinion that the current market value of the subject property (Townhome on Lot 27 within The *Mountain Villas at Elk Pass*), as of May 6, 2010, was:

> ### SIX HUNDRED SIXTY FIVE THOUSAND DOLLARS
> ### ($665,000.00)

**(8-E)** Based upon the information found in our investigation, coupled with our analysis and by virtue of our experience, it is our opinion that the current market value of the subject property (Townhome on Lot 29 within The *Mountain Villas at Elk Pass*), as of May 6, 2010, was:

> ### NINE HUNDRED THOUSAND DOLLARS
> ### ($900,000.00)

**(8-F)** Based upon the information found in our investigation, coupled with our analysis and by virtue of our experience, it is our opinion that the current market value of the subject property (Townhome on Lot 43 within The *Mountain Villas at Elk Pass*), as of May 6, 2010, was:

> ### FOUR HUNDRED NINETY FIVE THOUSAND DOLLARS
> ### ($495,000.00)

# *EXHIBIT H*

**(8-G)** Based upon the information found in our investigation, coupled with our analysis and by virtue of our experience, it is our opinion that the current market value of the subject property (Townhome on Lot 46 within The *Mountain Villas at Elk Pass*), as of May 6, 2010, was:

> **FIVE HUNDRED SEVENTY FIVE THOUSAND DOLLARS**
> **($575,000.00)**

## SECTION NINE (9)

**(9-A)** Based upon the information found in our investigation, coupled with our analysis and by virtue of our experience, it is our opinion that the current market value of the subject property (Condominium - Building 1 Unit 1 Lower Left - B1 U1 LL) within The *Mountain Villas at Elk Pass*), as of May 6, 2010, was:

> **FIVE HUNDRED TWENTY FIVE THOUSAND DOLLARS**
> **($525,000.00)**

**(9-B)** Based upon the information found in our investigation, coupled with our analysis and by virtue of our experience, it is our opinion that the current market value of the subject property (Condominium - Building 1 Unit 2 Lower Right - B1 U2 LR) within The *Mountain Villas at Elk Pass*), as of May 6, 2010, was:

> **FIVE HUNDRED TWENTY FIVE THOUSAND DOLLARS**
> **($525,000.00)**

**(9-C)** Based upon the information found in our investigation, coupled with our analysis and by virtue of our experience, it is our opinion that the current market value of the subject property (Condominium - Building 2 Unit 7 Upper Left – B2 U7 UL) within The *Mountain Villas at Elk Pass*), as of May 6, 2010, was:

> **FIVE HUNDRED THIRTY THOUSAND DOLLARS**
> **($530,000.00)**

# *EXHIBIT H*

**(9-D)** Based upon the information found in our investigation, coupled with our analysis and by virtue of our experience, it is our opinion that the current market value of the subject property (Condominium - Building 14 Unit 53 Lower Left – B14 U53 LL) within The *Mountain Villas at Elk Pass),* as of May 6, 2010, was:

> ## FIVE HUNDRED FIFTY FIVE THOUSAND DOLLARS
> ## ($555,000.00)

**(9-E)** Based upon the information found in our investigation, coupled with our analysis and by virtue of our experience, it is our opinion that the current market value of the subject property (Condominium - Building 14 Unit 54 Lower Right – B14 U54 LR) within The *Mountain Villas at Elk Pass),* as of May 6, 2010, was:

> ## FIVE HUNDRED SIXTY FIVE THOUSAND DOLLARS
> ## ($565,000.00)

**Again, it should be noted, each value is considered a stand alone value; <u>no</u> discounting for a bulk sales value has been indicated.**

Section Seven (7) through Section Nine (9) were appraised by Jeff W. Windle, GAA and Michael Petrus, Independent Fee Appraiser and the values, discussions and conclusions related to these Sections and only these Sections, are our own.

Respectfully submitted,

Jeff W. Windle, GAA
Certified General Real Estate Appraiser No. 30808

Michael Petrus, Independent Fee Appraiser
Certified General Real Estate Appraiser No. 30453

# *EXHIBIT I*

<table>
<tr><td>1</td><td colspan="2">John J. Hebert (#010633)<br>Mark W. Roth (#010708)</td></tr>
<tr><td>2</td><td colspan="2">Wesley D. Ray (#026351)<br><b>POLSINELLI SHUGHART PC</b></td></tr>
<tr><td>3</td><td colspan="2">3636 North Central Avenue, Suite 1200<br>Phoenix, AZ 85012</td></tr>
<tr><td>4</td><td colspan="2">Telephone: (602) 650-2000<br>Facsimile: (602) 264-7033</td></tr>
<tr><td>5</td><td colspan="2">E-mail: PhoenixBankruptcyECF@polsinelli.com<br>E-Mail: jhebert@polsinelli.com</td></tr>
<tr><td>6</td><td colspan="2">E-Mail: mroth@polsinelli.com<br>E-Mail: wray@polsinelli.com</td></tr>
<tr><td>7</td><td colspan="2"></td></tr>
<tr><td>8</td><td colspan="2"><i>Attorneys for Debtors</i></td></tr>
<tr><td>9</td><td colspan="2"></td></tr>
<tr><td>10</td><td colspan="2" align="center"><b>IN THE UNITED STATES BANKRUPTCY COURT</b></td></tr>
<tr><td>11</td><td colspan="2" align="center"><b>THE DISTRICT OF ARIZONA</b></td></tr>
<tr><td>12</td><td>In re:</td><td>Chapter 11 Proceedings</td></tr>
<tr><td>13</td><td>LONE TREE INVESTMENTS, LLC<br>PINE CANYON GOLF, L.L.C.</td><td>Case No. 2:10-bk-26776-RTBP<br>Case No. 2:10-bk-26779-RTBP</td></tr>
<tr><td>14</td><td>MOUNTAIN VISTA AT PINE CANYON, L.L.C.<br>ELK PASS, L.L.C.</td><td>Case No. 2:10-bk-26785-RTBP<br>Case No. 2:10-bk-26790-RTBP</td></tr>
<tr><td>15</td><td>DEER CREEK CROSSING, L.L.C.<br>CREEKSIDE VILLAGE HOMES, LLC</td><td>Case No. 2:10-bk-26792-RTBP<br>Case No. 2:10-bk-26794-RTBP</td></tr>
<tr><td>16</td><td align="center">Debtors.</td><td>Joint Administration under</td></tr>
<tr><td>17</td><td></td><td>Case No. 2:10-bk-26776-RTBP</td></tr>
<tr><td>18</td><td>This filing applies to:</td><td></td></tr>
<tr><td>19</td><td>☒ ALL DEBTORS</td><td><b>DECLARATION OF PATRICIA E.<br>NOLAN IN SUPPORT OF THE<br>DEBTORS' FIRST AMENDED JOINT</b></td></tr>
<tr><td>20</td><td>☐ SPECIFIED DEBTORS</td><td><b>PLAN OF REORGANIZATION DATED<br>JANUARY 24, 2011</b></td></tr>
<tr><td>21</td><td></td><td></td></tr>
<tr><td>22</td><td colspan="2"></td></tr>
<tr><td>23</td><td colspan="2">I, Patricia E. Nolan, under penalty of perjury, hereby declare as follows:</td></tr>
<tr><td>24</td><td colspan="2">1. I am an adult resident of Maricopa County, Arizona.</td></tr>
<tr><td>25</td><td colspan="2">2. I am of sound mind and make this declaration of my own free will and in support of</td></tr>
<tr><td>26</td><td colspan="2">the <i>First Amended Joint Plan of Reorganization Dated January 24, 2011</i> (the "Plan") filed by the</td></tr>
<tr><td>27</td><td colspan="2">Debtors in the above-captioned bankruptcy, and in connection with the attendant <i>First Amended</i></td></tr>
<tr><td>28</td><td colspan="2"></td></tr>
</table>

# *EXHIBIT I*

*Joint Disclosure Statement Relating to First Amended Joint Plan of Reorganization Dated January 24, 2011 (the "Disclosure Statement").*

3. All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

4. I am the president of Central and Osborn Properties, Inc., the manager of Debtor Lone Tree Investments, LLC (which is the sole member of each of the other Debtors), and a practicing member of the State Bar of Arizona.

5. I am familiar with the Debtors' operations and financial situation.

6. I am familiar with the status and history of the Debtors' reorganization, and assisted in formulating the Plan.

7. The Debtors, collectively, own and operate the residential community, golf course, and related facilities commonly known as Pine Canyon in Flagstaff, Arizona (the "Property").

8. Debtor Pine Canyon Golf, L.L.C. operates the golf course, and attendant facilities, while the other Debtors own various parcels of real property at varying stages of development within the Property.

9. Despite projected sales of real property, the Debtors' future revenues may be insufficient to satisfy operational expenses and the distributions required by the Plan.

10. To address this potential cash shortfall, the Plan provides for a $5.0 million revolving secured line of credit to be extended to the Reorganized Debtors by Flagstaff Acquisitions, L.L.C. (the "Post Confirmation Credit Facility").

11. Flagstaff Acquisitions, L.L.C. owns 99% of Debtor Lone Tree Investments, LLC.

12. Attached as Exhibit "G" to the Disclosure Statement are projections which show the necessity of the Post Confirmation Credit Facility, and the manner in which funds drawn thereunder will be used.

13. Without the availability of post-confirmation financing, the Debtors may run out of operating capital prior to making all of the distributions called for by the Plan.

2781253.1

# *EXHIBIT I*

14.     The Debtors' management has, in the past, taken efforts to solicit financing from sources other than Flagstaff Acquisitions, L.L.C.

15.     These efforts included, but were not limited to:

a.     Approaching the Debtors' principals and other investors regarding the possibility of an equity infusion;

b.     Contacting traditional (including Bank of America and Northern Trust Bank) and non-traditional lenders (including EFO Financial Group, LLC, Pacific Capital Group, L.L.C. and Green Street Capital Group, LLC) regarding the possibility of unsecured financing;

c.     Contacting traditional and non-traditional lenders regarding the possibility of unsecured financing allowable with a priority superior to all administrative expenses; and

d.     Contacting traditional and non-traditional lenders regarding the possibility of financing secured by a junior lien on the Property.

16.     None of the sources of financing with whom the Debtors inquired were willing to extend credit to the Debtors on terms more attractive than those offered by Flagstaff Acquisitions, L.L.C.

17.     Given the current credit climate, it is unlikely that further efforts would have resulted in any additional sources of financing or more attractive terms.

18.     Flagstaff Acquisitions, L.L.C. has agreed to extend the Post Confirmation Credit Facility to the Debtors with a 5-year maturity, with interest accruing at the rate of 15% per annum, and without the need for payment of any fees (points) at the initiation of the credit facility.

19.     The Debtors' management believes that the interest rate and other obligations associated with the Post Confirmation Credit Facility are reasonable and customary of debtor-in-possession loans.

20.     The Debtors' management believes that the absence of any loan origination fee is more favorable than most debtor-in-possession loans.

/ / /

3

# *EXHIBIT I*

1    21.    The Debtors' management, in exercise of its sound business judgment, believes that

2   post-confirmation financing is not only advisable, but critical to consummation of the Plan, and that

3   the Post Confirmation Credit Facility is in the best interests of the Debtors and their creditors.

4

5   _____
                    Patricia E. Nolan

6

7       SUBSCRIBED AND SWORN to before me on this 24th day of January, 2011, by Patricia E.

8   Nolan.

9   _____
                    Notary Public

10

11   My Commission Expires:

12   _____

13

**PATRICIA MELOSERDOFF**
Notary Public - Arizona
Maricopa County
Expires 12/07/2012

2781253.1