Randall D. Crocker, Esq. (Admitted Pro Hac Vice)
Mark F. Foley, Esq. (Admitted Pro Hac Vice)
VON BRIESEN & ROPER, S.C.
411 E. Wisconsin Ave., Ste. 700
Milwaukee, WI 53202
Telephone: (414) 276-1122
Facsimile: (414) 238-6532
Email: rcrocker@vonbriesen.com
mfoley@vonbriesen.com

Christopher H. Bayley (#010764)
Colleen M. Reider (#027260)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren
Phoenix, AZ 85004-2202
Telephone: (602) 382-6000
Facsimile: (602) 382-6070
Email: cbayley@swlaw.com
creider@swlaw.com

Attorneys for Creditor Silverleaf Acquisition Holdings, LLC,
successor-in-interest to Johnson Bank

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In Re:<br><br>LONE TREE INVESTMENTS, LLC,<br>PINE CANYON GOLF, LLC,<br>MOUNTAIN VISTA AT PINE CANYON, LLC,<br>ELK PASS, LLC,<br>DEER CREEK CROSSING, LLC,<br>CREEKSIDE VILLAGE HOMES, LLC,<br><br>Debtors. | Proceedings Under Chapter 11<br><br>Case No. 2:10-bk-26776-RTBP<br>Case No. 2:10-bk-26779-RTBP<br>Case No. 2:10-bk-26785-RTBP<br>Case No. 2:10-bk-26790-RTBP<br>Case No. 2:10-bk-26792-RTBP<br>Case No. 2:10-bk-26794-RTBP<br><br>Jointly administered under<br>Case no. 2:10-bk-26776-RTBP<br><br>**SILVERLEAF ACQUISITION HOLDINGS, LLC'S MOTION *IN LIMINE* TO EXCLUDE DECLARATION AND TESTIMONY OF MATTHEW C. SHANABERGER** |

Silverleaf Acquisition Holdings, LLC, successor-in-interest to Johnson Bank ("Silverleaf"), respectfully moves this Court *in limine* (the "Motion") for an Order excluding the declaration and testimony of Matthew C. Shanaberger ("Shanaberger") of Synthesis Realty Group

13129315

LLC ("Synthesis"). Shanaberger's declaration and testimony should be excluded, as they are inadmissible under Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell-Dow Pharmaceuticals*, 509 U.S. 579 (1993) ("*Daubert*").

This Motion is supported by the following Memorandum of Points and Authorities and all other prior pleadings and papers.

DATED this 23rd day of May, 2011.

                SNELL & WILMER L.L.P.

                By: /s/ CMR #027260
                     Christopher H. Bayley
                     Colleen M. Reider
                     One Arizona Center
                     400 E. Van Buren
                     Phoenix, AZ 85004-2202

                -and-

                Randall D. Crocker
                Mark F. Foley
                von BRIESEN & ROPER, S.C.

                Attorneys for Silverleaf Acquisition Holdings, LLC, successor-in-interest to Johnson Bank

13129315

**MEMORANDUM OF POINTS AND AUTHORITIES**

I. **INTRODUCTION AND BACKGROUND**

Silverleaf is the successor in interest to Johnson Bank as the holder of a $24 million–plus claim secured by nearly all of the Debtor's Property. *See* Claim No. 16; Transfer of Claim, filed on April 22, 2011, Docket No. 346.[1] Starting on May 25, 2011, this Court will conduct a two-day trial on confirmation of the Debtors' *First Amended Joint Plan of Reorganization Dated January 24, 2011*, as amended on March 17, 2011 (collectively, the "Plan", Docket Entry Nos. 108 and 303, respectively), filed by the above-captioned jointly-administered debtors, Lone Tree Investments, LLC, Pine Canyon Golf, L.L.C., Mountain Vista at Pine Canyon, L.L.C., Elk Pass, L.L.C., Deer Creek Crossing, L.L.C. and Creekside Village Homes, LLC (collectively, the "Debtors"). In preparation for the two-day trial on confirmation, this Court ordered that all direct expert testimony to be used by the parties at trial be completed by declaration. (*See* March 3, 2011 Minute Entry, Docket Entry No. 283). The Debtors seek to confirm a "dirt for debt" reorganization plan which proposes to satisfy a portion of Silverleaf's claim by deeding certain unimproved parcels (the "Deeded Property") in satisfaction of $18 million of this debt and paying the remaining debt out of a portion of the proceeds from projected future sales of other real estate collateral. Silverleaf objects. *See Johnson bank's Objection to Debtors' First Amended Joint Plan of Reorganization Dated January 24, 2011* (Docket Entry No. 263).

To obtain confirmation of the Plan, the Debtors bear the burden of proving by a preponderance of the evidence that the Plan gives Silverleaf property of a value, as of the effective date of the Plan, not less than the value of its collateral. 11 U.S.C. §1129(a)(7)(A)(ii) or (B). To meet this standard, the Debtors must establish the value of Silverleaf's collateral (and thus the amount of its secured claim) and the value of the Deeded Property to be applied in reduction of that secured claim. Otherwise, the Debtors cannot meet their burden of showing that Silverleaf will receive the indubitable equivalent of its claim or that the cash flow will be sufficient for the Plan to be feasible. The parties dispute, among other things, the value of the

---

[1] Silverleaf hereby requests the Court take judicial notice of these pleadings, and all other pleadings filed in the above-captioned case that are referenced herein, pursuant to Federal Rule of Evidence 201.

13129315

1 Deeded Property and the value of the remaining real estate owned by the Debtors (the "Property"), all of which is subject to a Deed of Trust in favor of Silverleaf.

The Debtors intend to rely solely on the opinions of Shanaberger to establish the value of the Debtors' real estate. Shanaberger is not a trained or certified real estate appraiser. His opinions are based upon his "review" of an outdated and flawed appraisal of the Property prepared for different purposes by Appraisal Technology, Inc. ("ATI") as of May 6, 2010 (the "ATI Appraisal").[2] The Debtors seek to introduce the ATI Appraisal through Shanaberger and his report. *See Appraisal Assessment and Development Operations* prepared by Synthesis and Dated March 17, 2011, a true and correct copy of which is hereto as **Exhibit A** and incorporated herein by reference. ("Shanaberger Report").

Silverleaf seeks to exclude Shanaberger's testimony since it lacks the attributes necessary for admissibility under the standards established by *Daubert v. Merrell-Dow Pharmaceuticals*, 509 U.S. 579 (1993) ("*Daubert*") and its progeny.

Shanaberger's proposed testimony does not meet the legal standard for consideration by this Court for at least three (3) independent reasons:

(1) The Shanaberger Report is not helpful because it does not answer the right question: the proper valuation for the purpose intended as of the date of confirmation.

(2) Shanaberger lacks the requisite expertise for the opinions expressed.

(3) Shanaberger's opinions lack the required scientific basis or other attributes of reliability to be admissible.

**II.  LEGAL ANALYSIS**

  **A.  The Court Should Exclude Proffered Expert Testimony That Does Not Satisfy the Requirements of Qualification, Reliability and Fit.**

Courts have the "broad discretion to make discovery and evidentiary rulings conducive to the conduct of fair and orderly trial . . . Within this discretion lies the power to exclude or admit expert testimony . . . ." *Campbell Industries v. M/V Gemini*, 619 F.2d 24, 27 (9th Cir. 1980). In order to promote public confidence in the legal system and protect the integrity of the

---

[2] The ATI Appraisal is too voluminous to file. Therefore, a copy will be provided upon request.

adversary process, "any doubt [as to an expert] is to be resolved in favor of disqualification." *Marvin Lumber v. Norton Co.*, 113 F.R.D. 588, 592 (D. Minn. 1986) *citing Cofflet v. Shell*, 577 F.2d 30, 32 (8th Cir. 1978).

Rule 702 of the Federal Rules of Evidence ("FRE"), governs admissibility of expert testimony in this case. FED. R. BANKR. P. 9017; FRE 101. FRE 702 provides that: (1) the expert must be sufficiently qualified to assist the trier of fact; (2) the testimony must be relevant to the facts of the case; (3) the testimony must be based upon sufficient facts and data; (4) the testimony must be the product of reliable principles and methods; and (5) the witness must have applied the principles and methods reliably to the facts of the case. Expert testimony is not admissible unless it is both relevant and reliable. *Id.*

The U.S. Supreme Court requires that trial courts perform a gatekeeping role to regulate the admission of expert testimony. The gatekeeping role applies whether it pertains to scientific expert testimony or "testimony based on technical and other specialized knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). The need for this is obvious, as expert witnesses have the potential to "be both powerful and quite misleading." *Daubert*, 509 U.S. at 595. The objective of the *Daubert* analysis is to insure that an expert's opinions are reached through the exercise of "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.

"Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." *Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (citations omitted); FRE 702, Advisory Committee Notes (2000). The Debtors have the burden of establishing that the admissibility requirements are met. FRE 702, Advisory Committee Notes (2000); *Lust v. Merrell Dow Pharmaceuticals, Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). If even one of these three requirements is lacking, the testimony should be excluded. *Schneider*, 320 F.3d at 404. Shanaberger and his proposed testimony do not meet the requirements of FRE 702.

**B.**     **Shanaberger is Not Qualified to Opine as to the Value of the Property.**

Shanaberger readily admits that his role in this case is to offer an opinion as to the value of the Debtors' real property. He does not qualify as such an expert.

13129315

- 5 -

1    To qualify as a testifying expert on the value of real property, it is not enough that the witness has general business experience or knows how to calculate discounted cash flows. *See, In re Spatz*, 222 B.R. 157, 172 (N.D. Ill. 1998); *In re Lipetzky*, 66 B.R. 648, 650 (D. Mont. 1986). It is not enough that the witness is involved in real estate sales, such as a real estate broker. *Donoway v. Tucker (In re Donoway)*, 139 B.R. 156 (Bank. D. Md. 1992).

Rather, in order to qualify as an expert in appraising the value of real property, a witness must have "training, experience, and education in the real estate appraisal field." *In re Spatz*, 222 B.R. 157, 172 (N.D. Ill. 1998). Even general appraisal experience is not enough; rather, a witness offering opinions regarding the value of real estate must have experience appraising real estate "comparable to the property at bar." *In re Lipetzky*, 66 B.R. 648, 650 (D. Mont. 1986) (appraiser with experience appraising residential properties not qualified to appraise commercial properties). Exclusion of a proposed valuation expert is appropriate when, among other things: (i) a witness lacks professional credentials in appraisals; (ii) is not a member of a recognized appraisal society; (iii) is not familiar with the Uniform Standards of Professional Appraisal Practice ("<u>USPAP</u>") (adherence to which is required for appraiser licensing in the State of Arizona, A.R.S. § 32-3601, *et. seq.*); (iv) has not participated in educational programs regarding appraisal; and (v) has not been qualified as an expert by courts, including the United States Bankruptcy Court for the District of Arizona. *Spectrum Golf, Inc. v. Chiti (In re Spectrum Golf, Inc.)*, 350 B.R. 857, 861 (Bankr. D. Ariz. 2006); *see also Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1050 (5th Cir. 1998) ("district court acted well within its discretion in refusing" testimony of proposed valuation expert who was not a licensed appraiser or real estate broker in any state, and who "had no formal schooling in the methods of appraisal").

Indeed, in Arizona, "No person other than a state licensed or state certified appraiser may receive a fee for a real estate appraisal or an appraisal review of real property in this state." A.R.S. § 32-603(6).

///

///

///

13129315

- 6 -

Shanaberger does not qualify to give real estate appraisal testimony:

- Shanaberger and his colleagues[3] "**are not appraisers.**" Exhibit A, Shanaberger Report, at 17. Shanaberger is not an MAI and is not certified, credentialed, or licensed as an appraiser in any jurisdiction. Deposition Transcript of Matthew C. Shanaberger ("Deposition") at p. 25, relevant portions of which are attached hereto as **Exhibit B** and incorporated herein by reference.

- Shanaberger's undergraduate degree is in International Marketing and his Master's degree is in real estate development. Neither is training as an appraiser. Exhibit A, Shanaberger Report, at 2.

- Through his two-man company, Synthesis, Shanaberger offers services as a "real estate advisory, sales and marketing firm," not as an appraiser. Exhibit A, Shanaberger Report, at 2. Rather than being professionally engaged as a real estate appraiser, he "has been actively involved in the acquisition, planning and development of luxury communities for 17 years" – essentially his entire professional career. Exhibit A, Shanaberger Report, p. 2.

In his line of work, Shanaberger and his business partners normally agree on a cash flow and then determines a value based on a discounting of that cash flow. Exhibit B, Deposition, at pp. 80-83. Here, there is no agreement between arms-length parties on the cash flow he assumes – sales of specific properties, at specified times. Rather, he has accepted the Debtors' own speculative projections and merely declared them to be "reasonable" without independent analysis.

This Court granted a motion to exclude a debtor's proffered appraisal expert in the factually analogous case of *Spectrum Golf, Inc. v. Chiti (In re Spectrum Golf, Inc.)*, 350 B.R. 857 (Bankr. D. Ariz. 2006). In *Spectrum Golf*, the debtor offered Damien J. Greco as its expert witness to appraise the value of a Robert Chiti's interest in OpenTech Alliance, Inc. *Id.* at 861. Applying the *Daubert* factors to exercise its role as a gatekeeper to exclude Mr. Greco's testimony, the Court found that Mr. Greco had "no experience which relates to … appraising a

---

[3] Although Mr. Shanaberger presents himself as an employee of various companies, only Shanaberger himself worked on this engagement.

13129315

business for third parties." *Id.* The Court acknowledged that Mr. Greco had received a Masters in Business Administration from New York University and that he had 35 years of professional experience; but also noted a number of deficiencies in his qualifications to offer expert appraisal opinions, several of which are applicable to the opinions proffered by Shanaberger:

> First, Mr. Greco has no professional credentials to appraise businesses or any interest therein. He is not a member of one of the appraisal societies, and he is not familiar with the Uniform Standards of Professional Appraisers. Second, Mr. Greco has not participated in any formal programs to remain current on the methodology, ethics, and the best practices in appraising a business or an interest in a business. Third, Mr. Greco has not been qualified as an expert witness in any court proceedings. Fourth, given Mr. Greco's current duties as Chief Executive Officer of Golf Switch and the reorganized Debtor, his impartiality as an expert witness could reasonably be questioned. Fifth, Mr. Greco does not use any of the standard approaches to value in valuing Open Tech.

*Id.* at 861.

Similarly, here: (1) Shanaberger has no professional credentials, memberships or knowledge related to appraising real estate; (2) Shanaberger has not participated in any formal programs to remain current on the proper standards for appraising real estate; (3) Shanaberger has not been recognized as an expert in appraising real estate in court proceedings; (4) Shanaberger is not an impartial expert hired to independently value the Debtors' real estate, but rather was hired to find support for the assumptions and conclusions of the proposed Plan; and (5) Shanaberger did not use the standard approaches in appraising the property in this case. Exhibit A, Shanaberger Report. Moreover, Shanaberger's opinions about the value of the Debtors' real estate were developed solely for the purpose of these confirmation proceedings, thus rendering them inherently less trustworthy. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1317 (9th Cir. 1995).

Similarly, the Court in *In re Med Diversified*, 334 B.R. 89 (Bankr. E.D. NY 2005), excluded the expert testimony of Scott Peltz regarding the value of a business, concluding that Mr. Peltz was not qualified as a valuation expert. *Id.* at 96-98. Like Shanaberger, Mr. Peltz admitted that he was not a certified valuation expert and that he does not issue valuation reports. *Id.* at n.13. Mr. Peltz further admitted that his report could not be considered "certified" because it did not meet "uniform standards for professional appraisal practices that are generally accepted

13129315

- 8 -

by professional business appraisers." *Id.* at 96. As a result, *Med Diversified* "[did] not accept Defendant's representations and argument that [Peltz's] substantive experience over the past twenty-plus years as an accountant and as a liquidating agent or bankruptcy trustee in bringing avoidance actions in the bankruptcy court add up to a satisfactory substitute for formal education and training in business valuations . . . ." *Id.* at 96-97. See also *In re Worldcom, Inc.*, 371 B.R. 33, 35, 39, 45 (Bankr. S.D.N.Y. 2007 (Proffered expert's 30 years of experience as an economist, researcher, and in "litigation support" provides an insufficient "nexus between his credentials and the subject matter of his testimony.") Here too, Shanaberger's experience in the marketing and development of real estate is no substitute for formal education, training, certification, and professional experience in appraising real estate – the expert function required for present purposes. *Id.*

*Spatz, Lipetzky, Spectrum Golf, Med Diversified* and *Worldcom* all instruct that it would be improper to allow Shanaberger, a non-appraiser without the requisite education, experience, certification, licensing or other expert credentials in the field of appraising real estate, to offer expert opinions regarding the value of the Property in this case.

### C. Shanaberger's Report Does Not Fit the Requirements of This Case: It Does not Answer The Question Relevant for Confirmation.

Even if one assumes, *arguendo*, that Shanaberger is qualified to give real estate appraisal testimony, his proffered testimony does not "fit" the case. His proposed testimony answers the wrong question.

There are two relevant valuation questions at confirmation: (1) what is the value of the Deeded Property on the date of confirmation if given to the secured lender in partial satisfaction of its debt; and (2) what is the value of the Debtors' remaining real property, which remains Silverleaf's collateral?

For the purposes of bankruptcy plan confirmation: "the value must be determined ***as of the date that the plan is confirmed***, and not at some other date." *In re Atlanta Southern Business Park, Ltd.*, 173 B.R. 444, 450 (Bankr. N.D.Ga. 1994) (emphasis added); see also COLLIER ON BANKRUPTCY, Volume 4, ¶ 506.03[10] ("courts generally agree that, for purposes of determining

13129315

- 9 -

the amount of a secured creditor's claim in the cramdown context, the relevant collateral should be valued as of the effective date of the plan.") (internal citations omitted).

While the Shanaberger Report does discuss the value of the Property, including the Deeded Property, the Property is valued over time, assuming lengthy marketing periods, and a resumption of the market conditions extant prior to the market crash and recession of 2008-2010. In particular, although Shanaberger purports to be providing an opinion of value as of the date of confirmation, he in fact values the Property based upon anticipated market changes occurring over a period of time *subsequent to confirmation*. (*See* Exhibit A, Shanaberger Report, 7-18). His Report fails to discuss the value of the Property at the proposed confirmation date – May 25, 2011.

Shanaberger's Report also fails to address the mandate of 11 U.S.C. § 506 that valuation must be "determined in light of the purpose of the valuation and of the proposed disposition" of the Property. Here, the Deeded Properties are being surrendered to Silverleaf in a "dirt for debt" exchange most closely akin to a forced distress bulk sale. However, Shanaberger assumes that the Deeded Property will be marketed and absorbed over time in a normalized market. Exhibit A, Shanaberger Report, 10-16. By failing to address either the value of the Property as of confirmation or the impact of the disposition of the Deeded Property as proposed by the Debtors, his opinion is wholly irrelevant to the questions before the Court, specifically, the value of the Property as of confirmation and, with respect to the Deeded Property, the bulk sale value on that date.

Under the Debtor's proposed Plan, the Deeded Property is delivered to Silverleaf all at once on May 26, in bulk, for holding or resale as Silverleaf sees fit. In contrast Shanaberger's valuation is based on the assumption that the Deeded Property will be marketed for 24-30 months (with some properties not ready for sale for 42 months), built up in a manner consistent with the Debtors' pre-bankruptcy development plan for Pine Canyon, sold in a market that has returned from its current state to the frothy bubble period valuations of 2006, and sold to individual retail buyers over time in successful coordination, not competition, with the Debtors' own real estate sales effort. *See* Exhibit A, Shanaberger Report, at 7-18. In short, Shanaberger asks, and

answers, the wrong question with regard to the Deeded Property.

Shanaberger also asks the wrong question with regard to the remaining Property. Shanaberger assumes that the remaining Property will have the same retail value now and in the future as it had in the heyday of the real estate bubble. He then asks the question: what discount rate should be applied to determine the present value of property with such a value in the future? His report is no more than the selection of a discount rate (or implicit rate of return) and a mechanical mathematical calculation from the assumed future values. But there is no "there there." That is, there is nothing but *ipse dixit* to support Shanaberger's view that the properties will have the projected values in the future. In effect, he assumes the conclusion as to present value.

Because Shanaberger's opinions do not provide any insight as to the question to be answered by this Court, they do not "fit" and they should be excluded under Rule 702 and *Daubert*.

### D. The Shanaberger Testimony Should be Excluded Because it is Unreliable.

Appraisers normally use three methods for valuing real estate. The "sales comparison" approach determines the amount agreed upon by willing buyers and sellers for the sale of similar properties, and then makes adjustments to the extent that the comparison properties are materially different from the property at issue. *See AMRESCO New England II, L.P. v. Vescio (In re Vescio)*, 227 B.R. 352 (Bankr. D. Vt. 1998); *In re Westpointe, L.P.*, 234 B.R. 431 (E.D. Mo. 1999) *aff'd* 241 F.3d 1005 (8th Cir. 2001). A second method, usually used with improved properties, determines the value of improvements by determining the cost to replace existing structures. *Ibid*. A third method, usually used with income producing property, looks to the cash flow from the property, such as net rents, and applies a capitalization rate – a market driven required rate of return-- to determine value. *Ibid*.

Here, Shanaberger could not, and has not, applied any of these recognized approaches. Shanaberger has not relied on the sales comparison approach for three reasons. First, he relies on the ATI Appraisal's conclusions, but Shanaberger criticizes several of the ATI comparables as inadequate. Exhibit A, Shanaberger Report, at 7-9, 11, 14-16. Second, the sales comparisons

used by ATI (both those on which Shanaberger relies and those he rejects) were from January, 2006 to February, 2009. Shanaberger acknowledges that these are too old to be relevant to a valuation 2-5 years later, even in a consistently normal market, much less a significantly changed and unstable market as in the present circumstances. Exhibit B, Deposition, at 55-56. Shanaberger also rejects sales data from any source other than sales within the Pine Canyon community itself on the grounds that there is nothing truly competitive with Pine Canyon's offerings, which is both contrary to the opinion of acknowledgement by the Debtors' own management that many golf community developments in Flagstaff, Phoenix and elsewhere are competitors, and is directly contrary to the sales comparables methodology which accepts such differences between properties and then makes informed judgments about the effect of those differences on value. Third, there have been no recent sales at Pine Canyon to use as comparables and few comparable sales anywhere else. The market is in a state where there simply are no short term buyers. This has resulted in the Debtors, themselves, reducing their projections as to the number of potential future sales, extending out the projected dates on which they will occur, and reducing the amount they hope to receive. *See Notice of Filing Amended Exhibit "G" to the Debtors' First Amended Joint Disclosure Statement Relating to First Amended Joint Plan of Reorganization Dated January 24, 2011*, Docket No. 352.

Shanaberger could not use the "cost of replacement" methodology because (i) it does not apply to unimproved raw land, and (ii) the cost of replicating the structures is much less than the cost of the improvements, and therefore the asking prices, on existing improved lots within Pine Canyon.

Shanaberger has used a discounted cash flow methodology, but not the one used by real estate appraisers in the traditional sense. Rather than looking at rental income from the property and determining a capitalization rate, Shanaberger instead accepts the guesswork projections of future sales provided by the Debtors' own management and assumes that the market prices for Pine Canyon real estate will return to the same pricing levels they had at the top of the market in 2006. His only rationale for doing so is that Debtors' management thinks this will occur (although their own projections are to the contrary), other smart people think the market is

13129315

- 12 -

starting to turn around, and "we're looking two years down the -- down the road essentially at -- at how things are -- are progressing. And it seems reasonable that as the resales begin to clear out, as some confidence returns to the project, first and foremost, and as it exits the -- this phase of -- of its financial planning, that -- that people will start being able to feel comfortable buying within the community again.." Exhibit B, Deposition, at p. 72. He then takes the *assumed* sales prices and sale dates, selects a discount rate provided by his regular business partners (none of whom actually said they would buy the property at the valuations Shanaberger proposes), and does an arithmetical calculation to get the desired present value. But by accepting the Debtors' projected future sales timing frequency and prices, Shanaberger has added nothing but a mechanical calculation to the process. He has, in effect, assumed the Debtors' conclusion.

Shanaberger's methodology with regard to his appraisal of the golf course is even more blatant inadmissible *ipse dixit*. After acknowledging that the golf course has lost more than a million dollars each year of its operations and is projected by the Debtors to continue to lose a million dollars or more each year going forward, and opining that the golf course likely had no residual value or a negative value, Shanaberger nevertheless opined it was worth $8 million. Exhibit B, Deposition, at 118-120. When asked how a property with permanently negative cash flow and no residual value could be worth $8 million, Shanaberger replied that in his experience, "golf courses have been vanity purchases." Exhibit B, Deposition, at p. 119. This valuation technique is best described as "pulling a rabbit out of my hat."

The testimony of a proffered expert should be excluded where "[the witness] has failed to use the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *In re MTBE*, 2008 WL 2324112, *4-5 (S.D.N.Y. 2008). Likewise, expert testimony should be excluded when it is based upon subjective beliefs or unsupported speculation which is no more than *ipse dixit* guesswork. *See General Electric Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) (determining that *ipse dixit* opinions may be excluded "where there is simply too great an analytical gap between the data and the opinion proffered."). Here, the opinions stated by Shanaberger fail to "fill in the gap" between the data upon which he bases his opinions and the opinions themselves. As a result, the proposed opinions are unreliable and

should be excluded.

Shanaberger's appraisal opinion about the Property the Debtors seek to retain and sell over time depends explicitly upon assumptions concerning the number, type, and timing of future sales. But what are those assumptions and what is their scientific basis? The projections are not his own. Rather, he as accepted the Debtor's own projections as "reasonable." Exhibit A, Shanaberger Report, at pp. 3, 10, 16. He does not say why they are reasonable in the face of all that has happened in the market and economy since 2008, in the face of no sales by the Debtors for nearly a year, in the face of the Debtors' own projections of declining prices, slower absorption, and changing sales composition, and the lack of any comparable sales data. The Debtors themselves have shown how unreasonable these assumptions are: they are based upon their lead salesman's projection of one year's sales assumptions and the belief that sales have been delayed because of the bankruptcy filing. Deposition Transcript of John Schraan ("Schraan"), relevant portions of which are attached hereto as **Exhibit C** and incorporated herein by reference, at pp. 26-30. But only one prospect has said that the bankruptcy is a deterrent. Deposition Transcript of Warren Smith, relevant portions of which are attached hereto as **Exhibit D** and incorporated herein by reference, at pp. 84-85. The remaining sales projections were derived without even the involvement of the lead salesman. Exhibit C, Schraan, at pp. 32-35. There is nothing here but guesswork and assuming one's own desired conclusion.

In *24/7 Records, Inc. v. Sony Music Entertainment, Inc.*, 514 F.Supp.2d 571 (S.D.N.Y. 2007), the court excluded the proffered "expert" testimony of two individuals relating to the value of 24/7 Records, Inc. The individuals had combined experience exceeding 70 years in the music industry; however, neither had any qualifications or training as appraisers for the purpose of valuing businesses. *24/7 Records*, 514 F.Supp.2d, at 573, n. 2. The court found that neither of the proposed experts were able to provide methods of valuation which could be evaluated, such that the opinions could meet the reliability requirements of FRE 702. *24/7 Records*, 514 F.Supp.2d at 575-576. The court stated "like [the other expert at issue], he does not explain how he valued these factors nor how he assessed their relative significance…[the expert] appears to rely on his instinct, an approach that cannot be tested, has no known rate of error, and is not

13129315

- 14 -

1  subject to any standards." *Id.* at 576 (citation omitted).  Whether it is Mr. Shanaberger himself or
2  his reliance on Mr. Hall's own "gut" feelings, there is nothing here that can be evaluated for
3  reliability; there is nothing which satisfies the requirements of FRE 702 and *Daubert*.

4  Shanberger also asserts that the Deeded Property will be "more valuable" if separated
5  from Debtors.  Shanaberger Report, p. 18.  However, he does not explain what, if any, appraisal
6  methods he employed to arrive at these conclusions, or that the ATI Appraisal "has not materially
7  changed" and that the ATI Appraisal's concluding values are still "reasonable."  Exhibit A,
8  Shanaberger Report, at p. 3.  However, he fails to state a discernable methodology for his
9  conclusions; they appear to be solely based on Shanaberger's subjective belief.

10  In determining a discount rate, a proffered expert cannot simply rely on his own "common
11  practice."  *In re Med Diversified*, 334 B.R. 89, 100 (Bankr. E.D. NY 2005).  Shanaberger's report
12  fails to provide any calculation or method as to how an appropriate discount rate should be
13  arrived at in the situation before the Court.  His report is devoid of anything other than conclusory
14  statements that the discount rate stated in the Brekan-Nava Group appraisal is incorrect.  Exhibit
15  A, Shanaberger Report, at 18.  Shanaberger does not explain his methodology in arriving at his
16  opinion as to an appropriate discount rate, including his conclusion regarding the discount rate.
17  Consequently, his opinions are unreliable and should be excluded.

18  Shanaberger did not prepare the ATI Appraisal.  An appraisal report is considered hearsay
19  where, as here, the appraiser who prepared the report will not be testifying.  *Waddel v.*
20  *Commissioner*, 841 F.2d 264, 267 (9th Cir. 1988) (court may refuse to admit an appraisal as
21  hearsay when the appraiser is not available for cross examination); *see also Cunningham v.*
22  *Masterwear Corp.*, 569 F.3d 673 (7th Cir. 2009) (property owner is not allowed to repeat another
23  person's valuation).  Further, the ATI Appraisal is outdated, as it provides a value as of May 6,
24  2010.  The United States Bankruptcy Court for the District of Arizona has given "no persuasive
25  weight" to valuation opinions derived from "outdated appraisals."  *In re Bashas' Inc.*, 437 B.R.
26  874, 917 (D. Ariz. 2010).  As such, Shanaberger's Report and his testimony should be excluded.

27  **III.  <u>CONCLUSION</u>**

28  Shanaberger's testimony should be excluded if fails any one of the tests of qualification,

13129315

- 15 -

fit, or reliability. In fact, his proposed testimony fails all three tests. Shanaberger's testimony should be excluded, *in limine*.

WHEREFORE, for the foregoing reasons, Silverleaf respectfully requests that the Court enter an Order excluding Shanaberger's Report and testimony, pursuant to Federal Rule of Evidence 702, and *Daubert*.

DATED this 23rd day of May, 2011.

SNELL & WILMER L.L.P.

By: /s/ CMR #027260
    Christopher H. Bayley
    Colleen M. Reider
    One Arizona Center
    400 E. Van Buren
    Phoenix, AZ 85004-2202

-and-

Randall D. Crocker
Mark F. Foley
von BRIESEN &ROPER, S.C.

Attorneys for Silverleaf Acquisition Holdings, LLC, successor-in-interest to Johnson Bank